**ELI LILLY & CO., Plaintiff-Appellee,**

v.

**Elmer B. STAATS, Comptroller General of the United States, and United States, Defendants-Appellants.**

No. 77–1280.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 4, 1977.

Decided April 12, 1978.

Rehearing and Rehearing En Banc Denied June 30, 1978.

---

905

Morton Hollander, Harland F. Leathers, Attys., Civil Div., Dept. of Justice, Washington, D. C., Virginia Dill McCarty, U. S. Atty., Indianapolis, Ind., for defendants-appellants.

Stephen W. Terry, Jr., Indianapolis, Ind., for plaintiff-appellee.

Before CUMMINGS and PELL, Circuit Judges, and CAMPBELL, Senior District Judge.*

CUMMINGS, Circuit Judge.

In this action brought under 28 U.S.C. §§ 1331, 1332, and 1337, plaintiff sought declaratory and injunctive relief with respect to the United States Comptroller General's request to examine certain of its books and records. According to the complaint, plaintiff, a manufacturer of drug products, was awarded a contract with the Veterans Administration in January 1974 and six contracts with the Defense Department in 1973. The contracts involved pharmaceutical products widely sold to plaintiff's commercial customers at its standard catalog prices. However, each product sold to the Government was sold below plaintiff's catalog price and at "a price lower than the price given any other person or entity."

The complaint also alleged that the contracts were awarded to plaintiff in response to bids solicited by the United States. Plaintiff was assertedly awarded the contracts because its bids were the lowest submitted to the Government.

In August 1974, the Comptroller General wrote plaintiff requesting that it make available for examination by the General Accounting Office (GAO) which he heads:

"all books, documents, papers, and other records directly pertinent to the contracts, which include, but are not limited to (1) records of experienced costs including costs of direct materials, direct labor, overhead, and other pertinent corporate costs, (2) support for prices charged to the Government, and (3) such other information as may be necessary for use to review the reasonableness of the contract prices and the adequacy of the protection afforded the Government's interests."

This request was pursuant to 10 U.S.C. § 2313(b) and 41 U.S.C. § 254(c).[1] According to the complaint, the Comptroller General's request exceeded his statutory authority and covered confidential business records whose disclosure would benefit plaintiff's competitors. Therefore, plaintiff sought a declaratory judgment that the Comptroller General's request exceeded his legal authority and sought a permanent injunction prohibiting him from examining the following documents:

"(a) Lilly records of experienced costs including costs of direct materials, direct labor, overhead, and other pertinent corporate costs,

"(b) Lilly records supporting prices charged to the Government, and

"(c) other Lilly records containing information for use by the Comptroller to review the reasonableness of the Lilly contract prices."

Two months after the filing of the complaint, the district court permitted the United States to intervene. On the following day, the United States filed an answer and counterclaim. The counterclaim alleged that each of the contracts contained the following standard clauses:

"(b) The Contractor agrees that the Comptroller General of the United States or any of his duly authorized representatives shall, until the expiration of 3 years after final payment under this Contract, or such lesser time specified in either Appendix M of the Armed Services Procurement Regulation or the Federal Procurement Regulations Part 1–20, as appropriate, have access to and the right to examine any directly pertinent books, documents, papers, and records of the Contractor involving transactions related to this contract.

"(c) The Contractor further agrees to include in all his subcontracts hereunder a provision to the effect that the

---

* Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

1. In his letter, the Comptroller General also referred to 31 U.S.C. §§ 53 and 67 but does not "base [his] claim of right" to examine the records on those statutes (App. 63a).

subcontractor agrees that the Comptroller General of the United States or any of his duly authorized representatives shall, until the expiration of 3 years after final payment under the subcontract or such lesser time specified in either Appendix M of the Armed Services Procurement Regulation or the Federal Procurement Regulations Part 1–20, as appropriate, have access to and the right to examine any directly pertinent books, documents, papers, and records of such subcontractor involving transactions related to the subcontract. The term 'subcontract' as used in this clause excludes (1) purchase orders not exceeding $2,500 and (2) subcontracts in purchase orders for public utility services at rates established for uniform applicability to the general public."

The counterclaim asserted that plaintiff's refusal to permit the Comptroller General to examine the records in question contravened 10 U.S.C. § 2313(b) and 41 U.S.C. § 254(c) and the contractual clauses. Therefore, the Government sought declaratory and injunctive relief in its favor.

Subsequently, the United States filed a motion for summary judgment on its counterclaim and the plaintiff filed a motion for summary judgment on its complaint and on the Government's counterclaim. Finally, the Comptroller General filed a motion for summary judgment.

After hearing oral arguments and considering the briefs, pleadings, affidavits, answers to interrogatories and depositions on file, the district court granted plaintiff's motion for summary judgment and denied all relief requested by the defendants. We reverse.

In granting summary judgment for plaintiff, the district court found in part as follows: The seven contracts in question were "negotiated fixed-price contracts." Six of them were awarded to the plaintiff, the sole offeror, on the basis of a comparison of its offered prices to its standard catalog prices. In each instance, the contract price was lower than the catalog price. Plaintiff was awarded the seventh contract because acceptance of the only other company's offer "was precluded by the Buy-American Act" (41 U.S.C. §§ 10a–10c) and because plaintiff's "offered price was [considered] fair and reasonable based on the competition received." Since the contract prices were identical to the prices initially offered by Lilly, the prices were not actually negotiated but were fixed prices "not based on any type of 'cost-plus' formula."

The district court found the contractual negotiations and performances were not "in any way dependent upon, or directly related to, Lilly's costs of producing the drugs purchased under the contracts, the profits realized by Lilly, or the methodology by which Lilly establishes its catalog prices for standard commercial articles." The court also found that the request for these records was initiated in 1971 by the Chairman of the Subcommittee on Monopoly of the Senate Select Committee on Small Business during hearings on the status of competition in the pharmaceutical industry. Plaintiff and five other pharmaceutical companies participated in phase I of the GAO's study of their manufacturing processes and marketing policies. However, in response to phase II of the GAO's study, they were unwilling to give the Comptroller General cost and pricing records on individual products purchased by the Government under specified contracts. Consequently, the Comptroller General sent the foregoing written request in August 1974 to plaintiff and the other five drug companies that engaged in his phase I. These letters were sent after representatives of the GAO conferred with the Chairman of the same Senate Subcommittee.

The court found that the Government's purpose was not to audit plaintiff's negotiations and performance of the seven contracts in question, but was as disclosed in response to one of plaintiff's interrogatories as follows:

"The sole purpose of the requested examination of Lilly's books and records is not to audit Lilly's negotiations and performance of the contracts involved in this suit. Rather, the purpose of the requested examination, as presently contemplat-

ed, is to review contract pricing by the Government's suppliers, including Lilly, of drug items to determine the adequacy of the protection afforded the Government by the negotiation techniques used by the procuring agencies. Accomplishment of this objective is contingent upon GAO's ability to gain access to the records needed to (1) ascertain the nature of the activities for which the drug firms are incurring costs, (2) to ascertain and verify the extent to which the costs of these activities affect the prices paid by the Government for items procured under the specified negotiated contracts, and (3) to determine the bases of firms' pricing considerations for the products and, particularly, the applicability of these considerations to any Federal procurement of the products involved."

Another purpose of the Government's study was "to have a better public understanding and legislative understanding of the economics of the industry."

The court found that plaintiff's major items of cost in producing and marketing its pharmaceutical products (including those sold to the Government)

"are general administrative costs, marketing costs, and research and development costs. These major items are not assigned or allocated to individual pharmaceutical products or sales contracts under Lilly's accounting system and no generally accepted accounting principle exists for making such an allocation of those types of indirect costs to specific products or specific contracts."

The court's final finding was that the records sought by the Comptroller General contain confidential business information and secrets of plaintiff which, if made public, would cause plaintiff irrevocable competitive injury.

Based on his 25 findings of fact, the district judge concluded that the Comptroller General's demand exceeded his statutory and contractual authority because his purpose was to conduct a research study on the economics of the entire pharmaceutical industry, whereas he was given inspection authority only to permit audits of the negotiations and performances of particular contracts awarded after negotiation. The court also concluded that the Comptroller General was not authorized to examine these documents because they do not directly pertain to, and do not involve transactions relating to, these seven contracts. In addition, the court held that the Comptroller General's demand was too broad because it encompassed records relating to the methods by which plaintiff established its standard catalog prices which were set without regard to these contracts and encompassed records of costs which plaintiff does not assign or allocate to particular products or contracts. Therefore, Judge Holder decided that the Comptroller General could only examine plaintiff's contract files on these seven contracts and other records which would enable him to determine:

"(a) Lilly's standard catalog prices for the products purchased under the specified contracts;

"(b) That the prices of the products purchased were based upon established catalog or market prices of commercial items sold in substantial quantities to the general public; and

"(c) That the prices received by the government under the contracts were equal to or less than the catalog prices."

The contractual clauses contained in each of the contracts and set out at pages 906–907 *supra* were pursuant to 10 U.S.C. § 2313(b) and 41 U.S.C. § 254(c), which respectively provide as follows:

"*Examination of books and records of contractor*

"(b) Except as provided in subsection (c), each contract negotiated under this chapter shall provide that the Comptroller General and his representatives are entitled, until the expiration of three years after final payment, to examine any books, documents, papers, or records of the contractor, or any of his subcontractors, that directly pertain to, and involve transactions relating to, the contract or subcontract" (10 U.S.C. § 2313(b)).

*"Negotiated contracts—Requirements Examination of books, records, etc., of contractors; time limitation;*

"(c) All contracts negotiated without advertising pursuant to authority contained in this chapter, chapter 11C of Title 5, chapter 10 of Title 40, and chapter 11 of Title 44 shall include a clause to the effect that the Comptroller General of the United States or any of his duly authorized representatives shall until the expiration of three years after final payment have access to and the right to examine any directly pertinent books, documents, papers, and records of the contractor or any of his subcontractors engaged in the performance of and involving transactions related to such contracts or subcontracts" (41 U.S.C. § 254(c)).

Both of the above statutes are essentially alike. The former applied to the six Defense Department contracts, and the latter to the Veterans Administration contract. It first should be noted that the statutes are limited to negotiated contracts, but plaintiff has admitted that these were negotiated contracts (Br. 58). Next, the statutes permit access only to the Comptroller General and his representatives, obviously referring to employees of the GAO which he heads, but do not prohibit the GAO from transmitting information gleaned from the records to appropriate governmental sources. The right of access exists until three years after final payment, not asserted as a stumbling block in the present case. Finally, in the case of 10 U.S.C. § 2313(b), the records to be examined must "directly pertain to, and involve transactions relating to, the contract or subcontract" or, in the

equivalent language of 41 U.S.C. § 254(c), the records must be "directly pertinent" and must involve "transactions related to such contract or subcontracts." Together with the issue of whether the Comptroller General's requests were, as the district court found, motivated by an improper purpose, the question whether the information requested fits within the language of these two clauses forms the prime focus of this appeal.

## I. The Comptroller General's Purpose

■ Plaintiff's argument that the Comptroller General's demand exceeds his authority because he is using his powers for an improper purpose is based on the principle of administrative law that power to investigate can be exercised only for the purpose for which the authority was granted (Br. 19). See 1 K. Davis, *Administrative Law* § 3.10.[2] Relying on the district court's conclusion that the Comptroller General in this case is using his authority for the purpose of conducting a research study of the economics of the entire pharmaceutical industry, plaintiff suggests that such a study is an improper purpose and therefore the demand violates Professor Davis' principle of administrative law.

■ Even assuming that the contractual powers of the GAO, which is a unique independent agency within the legislative branch of Government (see Cibinic & Lasken, The Comptroller General and Government Contracts, 38 *Geo.Wash.L.Rev.* 349, 349–350 (1970)), are subject to the same restraints as those on the subpoena powers of administrative agencies to which plain-

**2.** Stated more precisely, the principle is that "the purpose of the investigation must be to get information to fill a legitimate need of the agency." 1 K. Davis, *Administrative Law* § 3.10; see *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509, 63 S.Ct. 339, 87 L.Ed. 424. The difference between this statement of the principle and the one offered by plaintiff is that this statement apparently would deem proper an investigation aimed at evidence relevant to any of an agency's many purposes while plaintiff's statement might limit the use of the investigatory power to the purposes of the agency

that prompted the grant of the investigatory power, if a limited purpose can be identified. Because of our conclusion that defendant official's investigation fits within the purposes that prompted the grant of the investigatory power, we need not choose between the two potentially conflicting statements of the principle as they apply to the unique contractual powers and statutory scheme of the GAO. Cf. Morgan, The General Accounting Office: One Hope for Congress to Regain Parity of Power with the President, 51 *N.C.L.Rev.* 1279, 1364 (1973).

tiff refers, the Comptroller General's demand was not outside the purpose for which his investigatory authority was granted for two reasons. First, although the district court did find that one of the Comptroller General's purposes was to conduct a research study, it did not explicitly find that such a study was the only purpose of the information demand. Instead, it apparently recognized that one of the Comptroller General's purposes was to determine the costs of producing the items purchased in the contracts. See Finding of Fact 21, App. 137a. Given that the Comptroller General thus had more than one purpose in mind, another principle of administrative law becomes relevant. As the Ninth Circuit stated in *Lynn v. Biderman*, 536 F.2d 820, 826 (1976), certiorari denied, 429 U.S. 920, 97 S.Ct. 316, 50 L.Ed.2d 287, that principle is that "it is not * * * a ground to deny enforcement of a subpoena that it is being employed for a wrongful purpose if there is also a legitimate purpose for the subpoena." See also *Donaldson v. United States*, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580. Since (as we discuss in Part II *infra*) the cost elements of the items purchased are a legitimate area of inquiry under 10 U.S.C. § 2313 and 41 U.S.C. § 254, the Comptroller General's investigation is motivated by at least one legitimate purpose and therefore is a proper investigation under principles of administrative law.

■ A second reason why the Comptroller General's investigation is not motivated by an improper purpose is that even if the only purpose of the investigation were to conduct the research study, that purpose may be proper given the spectrum of statutes outlining the duties of the Comptroller General. This statutory spectrum is best outlined by noting the provisions cited by the Comptroller General in making his demand. In his written request to plaintiff of August 26, 1974, the Comptroller General stated his review of procurement of drugs by agencies of the federal government was being made pursuant to 31 U.S.C. §§ 53 and 67 (as well as under 10 U.S.C. § 2313(b) and 41 U.S.C. § 254(c)). Although his Answer to plaintiff's Interrog-

atory 10 denied that 31 U.S.C. §§ 53 and 67 were the basis for his "claim of right to have access to and examine" plaintiff's books and records, the answer did not constitute an abandonment of reliance on those provisions as spelling out his duties, and therefore his legitimate purposes, as opposed to his specific powers to obtain information. Therefore, we look to those and other related provisions to see if they provide a legitimate purpose for the present survey.

31 U.S.C. § 53 provides:

*"Investigations and reports by Comptroller General*

"(a) The Comptroller General shall investigate, at the seat of government or elsewhere, all matters relating to the receipt, disbursement, and application of public funds, and shall make to the President when requested by him, and to Congress at the beginning of each regular session, a report in writing of the work of the General Accounting Office, containing recommendations concerning the legislation he may deem necessary to facilitate the prompt and accurate rendition and settlement of accounts and concerning such other matters relating to the receipt, disbursement, and application of public funds as he may think advisable. In such regular report, or in special reports at any time when Congress is in session, he shall make recommendations looking to greater economy or efficiency in public expenditures.

"(b) He shall make such investigations and reports as shall be ordered by either House of Congress or by any committee of either House having jurisdiction over revenue, appropriations, or expenditures. The Comptroller General shall also, at the request of any such committee, direct assistants from his office to furnish the committee such aid and information as it may request.

"(c) The Comptroller General shall specially report to Congress every expenditure or contract made by any department or establishment in any year in violation of law.

"(d) He shall submit to Congress reports upon the adequacy and effectiveness of the administrative examination of accounts and claims in the respective departments and establishments and upon the adequacy and effectiveness of departmental inspection of the offices and accounts of fiscal officers.

"(e) He shall furnish such information relating to expenditures and accounting to the Office of Management and Budget as it may request from time to time."

This statute plainly authorizes the detailed scope of inquiry into underlying records that the Comptroller General is attempting here (see Cibinic & Lasken, *supra*, at 387), and it does so in connection with public reports. The more difficult question of whether the statute contemplates such an inquiry into the records of private contractors as well as government agencies can be answered in the affirmative by noting the significant amount of public funds spent in contracts with private firms (see *id.; Fullilove v. Kreps*, 443 F.Supp. 253, 258 (S.D.N. Y.1977) ($120 billion awarded annually)); and then recognizing that Section 53 deals with "*all* matters relating to the receipt, disbursement, and application of public funds" (emphasis added).[3] Thus it is our view that even though in 1921 when it enacted Section 53 Congress gave the Comptroller General significant powers of investigation only with respect to governmental records,[4] its language left him with a general responsibility to oversee the Government's spending as a whole, which necessarily included disbursements to private contractors. The fact that Congress waited until the 1950's (when dealings with or concern over private contractors may have increased) to give the Comptroller General specific investigatory power into private contracts does not vitiate the conclusion that at all times the terms of the legislation gave the Comptroller General the responsibility to oversee all expenditures.

Since 31 U.S.C. § 67, also relied upon in the Comptroller General's requesting letter, deals with duties of governmental agencies, it is not germane to this case. However, 31 U.S.C. §§ 60 and 65 lend further support to the Comptroller General's request because they also outline broad investigatory responsibilities. Thus Section 60 directs the Comptroller General to make an expenditure analysis of each federal executive agency which in his opinion "will enable Congress to determine whether [as here] public funds have been economically and efficiently administered and expended" whereas Section 65 contains the following Congressional declaration of policy as to accounting and auditing:

"*Congressional declaration of policy*

It is the policy of the Congress in enacting this chapter that—

"(a) The accounting of the Government provide full disclosure of the results of financial operations, adequate financial information needed in the management of operations and the formulation and execution of the Budget, and effective control over income, expenditures, funds, property, and other assets.

"(b) Full consideration be given to the needs and responsibilities of both the legislative and executive branches in the establishment of accounting and reporting systems and requirements.

"(c) The maintenance of accounting systems and the producing of financial reports with respect to the operations of executive agencies, including central facilities for bringing together and disclosing information on the results of the financial operations of the Government as a whole, be the responsibility of the executive branch.

"(d) The auditing for the Government, conducted by the Comptroller General of the United States as an agent of the Congress be directed at determining the extent to which accounting and related financial reporting fulfill the purposes specified, financial transactions have

---

**3.** But see Cibinic & Lasken, *supra*, at 387.

**4.** See 31 U.S.C. § 54.

been consummated in accordance with laws, regulations or other legal requirements, and adequate internal financial control over operations is exercised, and afford an effective basis for the settlement of accounts of accountable officers.

"(e) Emphasis be placed on effecting orderly improvements resulting in simplified and more effective accounting, financial reporting, budgeting, and auditing requirements and procedures and on the elimination of those which involve duplication or which do not serve a purpose commensurate with the costs involved.

"(f) The Comptroller General of the United States, the Secretary of the Treasury, and the Director of the Office of Management and Budget conduct a continuous program for the improvement of accounting and financial reporting in the Government."

Although it might be possible to argue that such general descriptions of responsibilities do not help define a proper purpose under a specific statute (see note 2 *supra*), that argument is not persuasive when as here the specific statute was enacted for the purpose of implementing the general responsibilities that had been outlined in the earlier legislation. That the access-to-records provisions in Sections 2313 and 254 were enacted to help implement Congress' listing of responsibilities in Sections 53, 60 and 65 is clear from the statement before the House of Congressman Hardy, sponsor of the legislation, that one of the major reasons for the legislation was "to give the Comptroller General the proper tools to do the job the Congress has instructed him to do." 97 Cong.Rec. 13198; see also *id.* at 13200; Hearings on Comptroller General Reports to Congress on Audits of Defense Contracts Before a Subcommittee of the Committee on Government Operations, 89th Cong., 1st Sess. 146 (1965) (statement of Herbert Rorback).

■ Thus even if a research study had been the Comptroller General's sole purpose, the statutory scheme outlining his powers and the legislative history of those statutes indicate that this request was authorized. While this interpretation of the statutes would give the Comptroller General broad supervisory responsibilities, the legislative history of those statutes does reflect at least one limitation on the powers available to implement those responsibilities: a restriction against making records disclosed under the access-to-records provisions public in a fashion allowing identification of individual companies. Disclosure of information about individual companies in a manner that would aid competitors apparently was not contemplated by the sponsors of Sections 2313 and 254. See 97 Cong.Rec. 13197. With that limitation, the applicability of which the Comptroller General has recognized (see Part IIC *infra*), we conclude that his request was properly motivated. Accord, *Hewlett-Packard Company v. United States*, 385 F.2d 1013, 1016 (9th Cir. 1967), certiorari denied, 390 U.S. 988, 88 S.Ct. 1184, 19 L.Ed.2d 1292; *Merck & Co., Inc. v. Staats*, Civil Action No. 74–1447 (D.D.C. Aug. 12, 1977) (slip op. 4).

## II. *The Comptroller General's Powers*

That the Comptroller General was acting in accord with a legitimate purpose would not alone be sufficient to justify his request in the absence of a statute or contract authorizing the actions he took in requesting the information. Plaintiff's second line of offense is that the inspection sought was not authorized by the statutory or contractual language (quoted at pages 908–909 and 906–907 *supra*). Those clauses gave the Comptroller General the "right to examine any pertinent books, documents, papers and records of the Contractor involving transactions related to this contract." His letter tracked that language but added

"which include, but are not limited to, (1) records of experienced costs including costs of direct materials, direct labor, overhead, and other pertinent corporate costs, (2) support for prices charged to the Government, and (3) such other information as may be necessary for use to review the reasonableness of the contract prices and the adequacy of the protection afforded the Government's interests."

This language was derived from the request approved in *Hewlett-Packard, supra.*

The few courts that have interpreted this language have reached differing conclusions. Judge Holder's opinion below gave the statutory language its narrowest reading, allowing the Government to obtain information only to determine Lilly's catalog prices for the purchased items, to determine whether the Government's purchase price was based on the catalog prices of items sold in substantial quantities to the general public, and to determine whether the prices paid by the Government were equal to or less than the catalog prices (App. 142a). A somewhat less restrictive interpretation was offered in *Bristol Laboratories v. Staats*, 428 F.Supp. 1388 (S.D.N.Y.1977). In that case, which grew out of the same set of inquiries by the Comptroller General as this case, the district court limited the Comptroller General to information that Bristol had agreed to offer: manufacturing costs (including raw and packaging materials, labor and fringe benefits, quality control and supervision); manufacturing overhead (including plant administration, production planning, warehousing, utilities and security); royalty expenses; and delivery costs. The court apparently accepted Bristol's argument that research and development, marketing and promotion, and distribution and administration costs should not be disclosed because they are "too remote to the contracts and have only the most general relation, if any, to the prices charged." *Id.* at 1389–1390. The *Bristol* court's conclusions recently were accepted by Judge Bryant in *Merck & Co., Inc. v. Staats*, Civil Action No. 74–1447 (D.D.C. Aug. 12, 1977).[5] Although plaintiff and the *Merck* court both sought to read it narrowly, we view the Ninth Circuit's opinion in *Hewlett-Packard Company v. United States*, 385 F.2d 1013 (1967), certiorari denied, 390 U.S. 988, 88 S.Ct. 1184, 19 L.Ed.2d 1292, as taking a considerably broader view. While it is true that the district court's order affirmed by the Ninth Circuit in *Hewlett-Packard* went no further than declaring that the Comptroller General could examine any records relating to "the cost of producing the items" furnished under the contracts, the scope of the order in that case and, more importantly, the reasoning of the reviewing court do not seem to be significantly different from the Comptroller General's position here. Plaintiff's observation that the *Hewlett-Packard* order did not expressly include reference to costs not assigned by the firm to individual products and similar general cost and pricing information is not persuasive both because the order included overhead costs, a type of cost that is not always assignable to individual products, and because the rationale of the Ninth Circuit's opinion, which emphasized the appropriateness of inquiry into the procurement process as a whole, was not limited to disclosure of the specific costs requested by the Comptroller General in that particular case.

## A. The Meaning of the Statutes

At least as applied to the pharmaceutical industry, we think that the broad reading of *Hewlett-Packard* is the reading most consistent with the plain meaning of the statutory language and with the legislative history. In interpreting the statutory language, as the Comptroller General contends, "it is hard to imagine anything more directly related to a contract than the cost of producing the items covered by it or the matters going into the makeup of the price" (Reply Br. 9). Accord, *Hewlett-Packard Company v. United States, supra*, at 1016. That such costs can be "directly pertinent" to the contract even though they are not all assigned by the company to the contract or to the product can be explained, at least as applied to contracts with pharmaceutical companies, by the fact that the manufacturing and distribution costs of individual pharmaceutical products have been estimated to constitute as little as 9 per cent of the products' sale prices. See Rucker, Public Policy Considerations and the Pricing of Prescription Drugs in the United States, 4 *Int. J. Health Services* 171, 173 (1974). Al-

---

**5.** We have been advised by the Government that both *Bristol* and *Merck* are being appealed.

though it might be possible to argue in other industries that costs such as research and development have such a small impact that they are not "directly pertinent" to the contract and its price, research and other costs not immediately attributable to one product form such a large portion of the costs of a pharmaceutical product that their import to such a contract seems inescapable.

In response to plaintiff's argument that including these items would not give full effect to the limits on disclosure implied by the use of the word "directly," without disputing that "directness" is a difficult concept to define,[6] it should be noted that costs such as research and development at the least appear to have a logical, causal and consequential relationship to a portion of the price of the products purchased by the Government. Further, contrary to plaintiff's contention, such costs are not "remote" within the established definitions of that term in relation to at least a portion of the price because their inclusion in the price of the product is not unforeseeable once the costs are incurred, nor is their impact on a part of the price significantly altered by any intervening cause. See generally W. Prosser, *Law of Torts* § 42 (4th ed. 1971). If such costs constituted a minimal share of the total price of the contract, it might be difficult to argue that these costs are "directly pertinent" to the price of the contract as a whole, but that issue does not seem to be presented on these facts. Thus in relation to the contract as a whole, these costs fit within the common and legal understandings of "directly pertinent." The mere fact that, as plaintiff asserts, it does not or even could not allocate costs such as research and development to an individual contract does not undercut the proposition that those costs are directly pertinent to an individual contract but merely indicates that they are directly pertinent to more than one individual contract.

While plaintiff did not offer this Court any precise alternate manner of interpreting the phrase "directly pertinent," its argument seems to limit "directly pertinent" to an inquiry into what issues were negotiated at the time of contracting (see, e. g., Br. 48–49). This interpretation apparently is based on the assumption that if the Government did not negotiate about an issue, it thereby considered it not to be pertinent. Such an interpretation might be reasonable if the statutory standard were that the information must be "directly pertinent" to the negotiation, but the standard is "directly pertinent" to the contract and plaintiff offers no reason to suppose that there would be a reason to negotiate about each item that might have a significant effect on the seller's cost or performance. In fact, plaintiff's proposed method of defining pertinence by analyzing what was negotiated would not serve even its interests in the long run because such a standard once adopted would simply encourage the Government to protract the negotiations by raising any conceivable issue about which it later might want information and would allow the Government to make an issue pertinent simply by introducing it in the negotiations.

In the final analysis, plaintiff's suggested interpretation of examining what was negotiated rests on its conclusion that Sections 2313 and 254 were designed only to uncover "improprieties in the negotiation of Government contracts" (Br. 43, quoting 97 Cong.Rec. 13377). However, our view of the legislative history, outlined in the following section, is that controlling fraud was not the only purpose of the legislation and that another concern of the legislators was with excessive pricing. Given this latter purpose and our view of the meaning of "directly pertinent," the access-to-records clauses should be interpreted so that an item is "directly pertinent" to a contract if

6. See, e. g., W. Prosser, *Law of Torts*, 263–267 (4th ed. 1971) (discussing direct cause in tort law); G. Gunther, *Cases and Materials on Constitutional Law*, 626–628 (8th ed. 1970) (discussing direct burdens on interstate commerce); W. Gellhorn & C. Byse, *Administrative Law Cases and Comments*, 201–211 (6th ed. 1964) (discussing direct injury as limit on standing).

it is a significant input in the cost of the product purchased in the contract.

### B. *The Legislative History of the Statutes*

■ Despite its brevity, the legislative history of Sections 2313 and 254 lends support to the Comptroller General's contention that an inquiry into whether costs are excessive was intended by the drafters of those bills. The sponsor of the legislation, Congressman Hardy, made this added purpose apparent when he explained that under its new authority the GAO would "find [whether] the rates [prices] were excessive" and that in addition to deterring improprieties the new authority also would deter "wastefulness in the negotiation of contracts." 97 Cong.Rec. 13198. Consistent with this purpose, Congressman Hardy recognized the GAO's authority "to look behind the rate [price] which had been established." *Id.*[7] Although no emphasis need be placed upon it, it is instructive to note that the GAO's consistent interpretation of the access-to-records clauses, entitled to weight as the administrative interpretation of the statute (see J. McBride & T. Touhey, *Government Contracts* § 2.20) and as an interpretation voiced before Congress and not changed by it (cf. *Kay v. Federal Communications Commission,* 143 U.S.App.D.C. 223, 443 F.2d 638, 646 (1970)), has been that "Congress intended the GAO to examine the books and records of the contractor to make certain that the Government was getting a fair deal out of negotiated contracts." Hearings on Comptroller General Reports to Congress on Audits of Defense Contracts Before a Subcommittee of the Committee on Government Operations, 89th Cong., 1st Sess. 147 (1965) (statement of Robert Keller); see *id.* at 44 (statement of Comptroller General Joseph Campbell); 115 Cong.Rec. 25801; J. McBride & T. Touhey, *supra,* § 7.140[1] (citing unpublished Comptroller General opinions).

Plaintiff's objections to this interpretation of the legislative history fall into two groups. The first group of objections disputes that Congress intended an inquiry into wastefulness by noting gaps in the legislation that allegedly are inconsistent with such an intent and later legislation from which the opposite intent could be inferred. Thus plaintiff argues that had Congress' concern been with wastefulness and not just fraud, it would have extended the scope of the legislation to advertised contracts as well. However, it is not illogical to assume that Congress simply felt the problem of waste was more acute in negotiated contracts (see generally Cibinic & Lasken, *supra,* at 387–388); in any event plaintiff's argument proves too much because it would still have some application even if as plaintiff contends Congress was only concerned with fraud. Similarly, plaintiff's argument that Congress could not have intended to inquire into wastefulness in contracts such as the one here in which the drugs were supplied to the Government "at a fixed price at or below the wholesale market price" (Br. 35) ignores the fact that the information sought by the Government may show that the prices it paid were nevertheless much too high. It should be noted that this same situation was present in *Hewlett-Packard* and not found determinative. See 385 F.2d at 1014.

Although plaintiff relies on subsequent history to restrict the Comptroller General's power, it is improper to resort to such materials when, as here, the relevant statutory provisions taken together plainly support the Government. *Haynes v. United States,* 390 U.S. 85, 87 n. 4, 88 S.Ct. 722, 19 L.Ed.2d 923; *Wisconsin Cheeseman, Inc. v. United States,* 388 F.2d 420, 423 (7th Cir. 1968). In any event, the failure to pass S. 2268 (94th Cong., 1st Sess.) giving the Comptroller

---

**7.** Lilly purports to distinguish these statements because they were made at least in part in reference to specific examples of proposed investigations that do not anticipate fully the unique circumstances involved in this investigation. However, the current investigation fits within the spirit and facial language of those

statements, and in the absence of a persuasive logical difference between the examples discussed and the instant case it is unreasonable to limit the Comptroller General's power to cases precisely fitting the examples offered by Congressman Hardy to explain the general powers conferred.

General access to records in connection with profit studies, which plaintiff uses to argue that Congress disapproves of such power, could easily mean that Congress ultimately considered he already had sufficient inspection powers to justify requests such as the one at issue here. Cf. *Red Lion Broadcasting Co. v. Federal Communications Commission*, 395 U.S. 367, 382 n. 11, 89 S.Ct. 1794, 23 L.Ed.2d 371.

Finally, plaintiff argues that the access-to-records authority must be "construed in harmony" with other federal procurement laws (Br. 47), specifically the Truth-in-Negotiation Act (10 U.S.C. § 2306) and the Renegotiation Act (50 U.S.C. App. § 1216). Apparently the argument is that because the other federal procurement laws specifically exempt contracts such as the one here on the ground that they are based on established catalog prices, therefore the access-to-records clauses must be read similarly. However, even assuming that other expressions of Congress at different times have any relevance in interpreting legislation (see *Benevento v. United States*, 461 F.2d 1316, 1322, 198 Ct.Cl. 772 (1972), certiorari denied, 409 U.S. 1038, 93 S.Ct. 516, 34 L.Ed.2d 486), such relevance is not persuasive when as here the legislation clearly has no exemption provision. In fact, it can be argued that the proper inference to be drawn, if any, is that since Congress in the Renegotiation Act demonstrated its ability to draft a specific exemption provision, its failure to do so in the access-to-records legislation indicates that no such exemption was intended. See *United States v. Columbia River-Longview Bridge Co.*, 99 F.2d 287, 289 (9th Cir. 1938). Although as plaintiff submits there may be some anomaly in requiring disclosure here when disclosure might not be required under other procurement statutes, it would be even more anomalous to deny this disclosure to the Government in this case, in which it has contracted for disclosure, when it is likely that the Government could compel the same disclosures from plaintiff in discovery proceedings even in litigation in which plaintiff is not a participant. See *United States v. International Business Machines*, 66 F.R.D. 186 (S.D.N.Y.1974).

Beyond these attempts to infer legislative intent, plaintiff's second type of objection seeks to prove legislative intent by relying on the discussion of the access-to-records legislation in the Congress and focusing specifically on Congressman Hoffman's insertion of the word "directly" into the legislation. However, plaintiff can point to no language in the legislative history to indicate that the word "directly" is to be given a meaning different from its normal interpretation discussed *supra*. In offering the amendment, Congressman Hoffman said only that his purpose was "to limit the snooping that may be carried on under this bill which we do not have the votes to defeat." 97 Cong.Rec. 13377. Significantly, Congressman Hardy did not oppose the amendment and it was passed without opposition. Of course "snooping" was left undefined [8] and the extent to which it was to be limited was not explained. In our view the present request cannot be deemed snooping because, like the information requested in *Hewlett-Packard,* these costs "directly pertain to, and involve transactions related to, those contracts" (385 F.2d at 1015) and are therefore appropriate subjects for inspection. Thus at the very least the legislative history of Congressman Hoffman's amendment provides no basis to depart from the meaning of "directly pertinent" derived from an interpretation of that phrase and from an analysis of the legislative history of the legislation as a whole.

**8.** Attempting to cull the meaning of the word "snooping" from other comments by Congressman Hoffman during the Congressional debate, all of which were made in reference to other proposed amendments, even assuming the relevance of such comments, is a difficult task because the Congressman voiced so many concerns that there is no logical way to identify which one or ones he regarded as the "snooping" that he sought to limit. In addition to discussing the scope of the inquiries, for example, he also attacked the time involved in any inquiry (97 Cong.Rec. 13373) and the manner in which the Comptroller General's representatives conducted the inquiries (97 Cong.Rec. 13377).

### C. *Remaining Issues*

Apart from the statutory wording and its legislative history, plaintiff offers three further arguments aimed at limiting or striking the Comptroller General's request. First, plaintiff argues that the access-to-records clauses must be construed narrowly to avoid conflicting with Lilly's right to privacy under the Fourth Amendment. But even assuming that the consent given by the plaintiff when the contract was signed could be deemed ineffective because the consent was required by the Government (but see *United States v. Biswell,* 406 U.S. 311, 316, 92 S.Ct. 1593, 32 L.Ed.2d 87), the administrative law cases relied upon by plaintiff itself indicate that plaintiff's Fourth Amendment rights are protected if the requests are, as here, "reasonably related" to an investigation within the jurisdiction of the requesting agency. *Civil Aeronautics Board v. United Airlines,* 542 F.2d 394, 401–402 (7th Cir. 1976); see *Equal Employment Opportunity Commission v. University of New Mexico-Albuquerque,* 504 F.2d 1296, 1303 (10th Cir. 1974).

Related to this privacy argument is a second argument that plaintiff would suffer competitive injury upon disclosure of the requested information. However, in support of the motion of the United States for summary judgment, the first affidavit supplied by the GAO states that "GAO does not intend to identify individual drug firms or specific products in any report issued to the Congress" and that no "information other than that pertaining to a contractor's government business would appear in a report issued by GAO or otherwise be made public." The second GAO affidavit provides in part as follows:

"3. I [Gregory Ahart] know that GAO intends that any report made using data obtained from Lilly will be made so that identification of Lilly or its products is not reasonably possible and Lilly will be afforded a reasonable period of time before release of such report to examine and comment upon it.

"4. I know that GAO intends to use its best efforts including resort to judicial remedies, if appropriate, to prevent the release of any data obtained from Lilly to an individual Member of Congress or to any person or agency outside GAO.

"5. I know that GAO intends that the only request for data obtained from Lilly which would be honored by GAO would be an official written request submitted by either House of the Congress or a Chairman of a House, Senate or Joint Committee having jurisdiction over the subject matter of the proposed study and then only to the extent authorized by and directed by law. I know that GAO intends that such a request will not be honored until GAO has first notified Lilly and this Court that a request has been made.

"6. To the best of my knowledge and belief, GAO has never honored or agreed to honor any request for confidential costs and related pricing data pertinent to specified individual drug firms or products."

In the court below, the Government submitted a proposed order granting it summary judgment but providing that the information obtained from plaintiff "shall be held in confidence and shall not be provided or otherwise made available by the Comptroller General to any person or agency outside the General Accounting Office except as provided" in two subsequent subparagraphs. The first of those subparagraphs provided that after receiving plaintiff's comments the GAO could make such data available to outsiders "in such a way that any direct or indirect identification of Lilly * * * is not reasonably possible." The next subparagraph provided that after seven days' notice to plaintiff the Comptroller General could submit information obtained from plaintiff in response to an official written request of either House of Congress or any Congressional Committee or Joint Committee having jurisdiction over the subject matter of the GAO's pharmaceutical industry study "to the extent authorized and directed by law." Therefore, it is apparent that the Government is properly cognizant of plaintiff's need for confidentiality.

Focusing on the contractual nature of the access-to-records clauses, plaintiff lastly relies on language in *Bristol* and *Merck* that the interpretation of any contractual provision turns on the intent and understanding of the parties involved and that "it is inconceivable" that a contracting firm would have understood the clause in the manner in which the Government now interprets it. See *e. g., Merck, supra,* mem. op. at 5. Even assuming that Lilly's understanding would be controlling, we disagree with the *Bristol* and *Merck* language, at least as applied to this case, since the contracts at issue were signed after the landmark *Hewlett-Packard* decision and Lilly knew that the Government's similar position was adopted there or at least is chargeable with that knowledge. See *Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 674 n. 8, 97 S.Ct. 2054, 52 L.Ed.2d 665.

The Government's counterclaim sets forth the following demand for access to and examination of:

" * * * any books, documents, papers, or records of plaintiff Lilly that relate to and involve transactions relating to pricing and experienced costs including costs of direct materials, labor, overhead and other corporate costs, support for prices charged to the Government and such other necessary information which would permit his [the Comptroller General's] representatives to review the reasonableness of the contract prices provided for in the aforesaid contracts."

The plaintiff describes this as a request for records such as involved in *Hewlett-Packard* (Br. 53). The Government's brief reiterates that it seeks only the relief requested in its counterclaim (Br. 41). Therefore, the district court need not grant access to any additional documents, and no information need be produced relating to classes of costs that have no more than a *de minimis* impact on the price of a product purchased by the Government. In granting summary judgment for defendants on remand, the district court is directed to include the confidentiality subparagraphs contained in defendants' proposed order previously submitted below.

Reversed and remanded for further proceedings consistent herewith.

PELL, Circuit Judge, dissenting.

Viewing as I do, the majority opinion in this case as an unwarranted, and unfortunate, extension of the Big Brother concept into legitimate privacy in the industrial field, I respectfully dissent. While I might have adopted minor differences of phraseology here and there in a dispositive opinion from that used by Judge Holder in his detailed Summary Judgment, those differences are so minimal, and his analysis and legal conclusions appear to me to be so eminently correct, I would adopt that judgment as the judgment of this court. Because Judge Holder's Summary Judgment is not reported, and although substantial portions thereof have been set forth in the majority opinion of this court, so as to put the case into proper perspective, I am attaching a copy of it to this dissenting opinion.

With all due respect to the obviously careful and thorough draftsmanship reflected in the majority opinion, I am unable to come away from a reading of it without the feeling that it strains to find justification for the Comptroller's broadsweeping attempt to delve into information in excess of his authority under law. This appears particularly evident in that portion of the opinion falling back for support on 31 U.S.C. §§ 53 and 67, sections of statutes which apparently the Comptroller himself has abandoned as supporting his "claim of right," and which do not appear as citations in the briefs filed by the Comptroller in this court.

I cannot be unmindful of the contrary *holding* in *Hewlett-Packard Company v. United States,* 385 F.2d 1013 (9th Cir. 1967), *cert. denied,* 390 U.S. 988, 88 S.Ct. 1184, 79 L.Ed.2d 1292 (1968). It pervades on a *passim* basis both the two briefs of the Comptroller and the majority opinion. That the majority opinion is relying more on the *holding* of that case than the acuteness or depth of the analysis appears rather clear

from a comparison of the length of *Hewlett-Packard* with the majority opinion in the present case. It would seem that the extended and detailed analysis of the majority opinion would scarcely have been necessary if *Hewlett-Packard* had set forth a persuasively correct analysis. Two federal district judges, of course, in the pharmaceutical context here involved have declined to follow the broad approach which the majority finds in *Hewlett-Packard*. *Bristol Laboratories Division of Bristol-Myers Company v. Staats,* 428 F.Supp. 1388 (S.D.N.Y. 1977); *Merck & Co., Inc. v. Staats,* Civil Action No. 74–1447 (D.D.C. Aug. 12, 1977). Even if the majority in the present case were unwilling to accept what they have termed as Judge Holder's "narrowest reading" of the language involved, it would appear to me that the *Bristol* and *Merck* readings should, in any event, have been an appropriate stopping place. I agree with Lilly's analysis of *Hewlett-Packard* that the Ninth Circuit's interpretation of the word "contract" is tortured and that the key words are "directly pertinent." *Hewlett-Packard,* of course, did not concern an industry study or alleged improper purpose.

In sum, the judiciary should not give the Comptroller coercive power to pursue quidnuncish purposes which power has been refused by Congress and which would require private companies to open their records to him to make it easier for him to study the cost and practices of the entire pharmaceutical industry. In the present case, which must be considered and determined on its own particular facts, because neither the negotiations nor the performance of the seven contracts was in any way dependent upon or directly related to, Lilly's costs of production, profits, or pricing methodology, the records relating to such information cannot, in my opinion, be deemed "directly pertinent" to those contracts, as required by the statutes and contract clause.

## APPENDIX

### SUMMARY JUDGMENT

This cause is before the Court on the motion of the defendant-intervenor, the United States of America, for summary judgment on its Counterclaim, and the motion of the plaintiff, Eli Lilly and Company, for summary judgment on its Complaint and on the Counterclaim, pursuant to Rule 56 of the Federal Rules of Civil Procedure. The Court, having considered the pleadings, affidavits, answers to interrogatories and depositions on file, and the briefs filed in support of and in opposition to the motions, and having heard oral argument and being duly advised in the premises, now finds the facts and states its conclusions of law as follows:

## I.

### Findings of Fact

1. Plaintiff, Eli Lilly and Company ("Lilly"), is a corporation organized and existing under the laws of the State of Indiana with its principal place of business in Indianapolis, Indiana. It is engaged, among other things, in the business of manufacturing drug products and marketing them in intrastate and interstate commerce, including sales to various agencies of the federal government.

2. The defendant, Elmer B. Staats, is the Comptroller General of the United States and is a citizen of a state other than the State of Indiana.

3. This action arises under the laws of the United States, particularly the Armed Services Procurement Act, 10 U.S.C. § 2313(b), and the Federal Property and Administrative Services Act, 41 U.S.C. § 254(c). An actual controversy exists within the jurisdiction of this Court between Lilly and the Comptroller General.

4. The amount in controversy exceeds $10,000.00, exclusive of interest and costs.

5. Lilly initiated this action by filing its Complaint for a declaratory judgment pursuant to 28 U.S.C. § 2201 and for a permanent injunction, asking the Court to declare that a request by the Comptroller General to examine certain records of Lilly exceeds his legal authority and to enjoin the Comptroller General from examining or attempt-

ing to examine those records. The United States of America ("the government") intervened and filed a Counterclaim for a declaratory judgment and permanent injunction, asking the Court to declare that the Comptroller General has the right to examine the records of Lilly, to enjoin Lilly from preventing the Comptroller General from examining the records, and to direct Lilly to make the records available for examination.

6. The Veterans Administration ("VA") and the Defense Supply Agency ("DSA") of the Defense Department awarded certain negotiated fixed-price contracts for pharmaceutical products to Lilly. The contract numbers, dates of award, contract prices and dates of final payment on the contracts are as follows:

| Contract No. | Date of Award | Price | Date of Final Payment |
|---|---|---|---|
| **VA** | | | |
| V797P–5169c | 1– 8–74 | $5,142,152.80 (estimated) | 4–29–76 |
| **DSA** | | | |
| DSA120–74–C–1401 | 11– 7–73 | 29,084.00 | 3–20–74 |
| DSA120–74–C–0125 | 6–27–73 | 204,456.96 | 11– 9–73 |
| DSA120–74–C–1639 | 11–28–73 | 461,429.28 | 4–22–74 |
| DSA120–74–C–0896 | 10– 9–73 | 78,918.00 | 5–10–74 |
| DSA120–74–C–1176 | 10–19–73 | 31,767.50 | 3–13–74 |
| DSA120–74–C–1640 | 11–28–73 | 45,923.20 | 4–19–74 |

7. The contracts were awarded to Lilly as a result of Lilly's submitting a proposal to the agency involved in response to the agency's solicitation of a proposal from Lilly. With respect to six of the contracts, Lilly was the sole offeror, and the contracting agency awarded the contract to Lilly on the basis of a comparison of Lilly's offered prices to Lilly's standard catalog prices for the drugs being purchased. In each case, the contract price was lower than Lilly's standard wholesale commercial catalog prices. The government, therefore, in every purchase from Lilly acquired Lilly products at prices lower than the going commercial market price for those products.

With respect to the seventh contract (DSA120–74–C–1640), offers were submitted by two companies and the award was made to Lilly because acceptance of the other company's offer was precluded by the Buy-American Act, and also because the government contracting officer determined that the offered price was fair and reasonable based on the competition received.

The product prices in each of the seven contracts were identical to the prices initially offered by Lilly and were not actually negotiated. The prices in each contract were fixed and were not based on any type of "cost-plus" formula.

Lilly was not required to submit cost or pricing data to the contracting agencies prior to the award of any of the contracts, because the product prices in all of the contracts were based either on adequate price competition or on established catalog or market prices of commercial items sold in substantial quantities to the general public, within the exemption provisions of the Truth-In-Negotiation Act [10 U.S.C. § 2306(f)] and, in the case of the VA contract, the exemption provisions of the similar federal procurement regulation [41 C.F.R. § 1–3.807–3(a) and (b)]. In addition, each of the contracts is exempt from the Renegotiation Act (50 U.S.C. App. §§ 1211, et seq.) because the contracts were for "standard commercial articles." 50 U.S.C. App. § 1216(e)(1).

8. Neither the negotiations nor the performance of the seven contracts by Lilly or the government were in any way dependent upon, or directly related to, Lilly's costs of producing the drugs purchased under the contracts, the profits realized by Lilly, or the methodology by which Lilly establishes its catalog prices for standard commercial articles.

9. Each of the contracts contains an access-to-records clause which provides in pertinent part:

"The Contractor agrees that the Comptroller General of the United States or any of his duly authorized representatives shall, until the expiration of three years after final payment under this contract * * *, have access to and the right to examine any directly pertinent books, documents, papers, and records of the Contractor involving transactions related to this contract."

That clause was included in the DSA contracts pursuant to the provisions of 10 U.S.C. § 2313(b) which provides:

"(b) Except as provided in subsection (c), each contract negotiated under this chapter shall provide that the Comptroller General and his representatives are entitled, until the expiration of three years after final payment, to examine any books, documents, papers, or records of the contractor, or any of his subcontractors, that directly pertain to, and involve transactions relating to, the contract or subcontract."

and was included in the VA contract pursuant to the provisions of 41 U.S.C. § 254(c) which provides:

"(c) All contracts negotiated without advertising pursuant to authority contained in this Act shall include a clause to the effect that the Comptroller General of the United States or any of his duly authorized representatives shall until the expiration of three years after final payment have access to and the right to examine any directly pertinent books, documents, papers, and records of the contractor or any of his subcontractors engaged in the performance of and involving transactions related to such contracts or subcontracts. * * *"

10. Lilly has been selling pharmaceutical products to agencies of the United States at least since World War II. The government's business constitutes a very small part of Lilly's sales of pharmaceutical products, approximately two percent. The government purchases Lilly pharmaceuticals in basically two ways: (1) on an as-needed basis at or below Lilly commercial wholesale catalog prices, and (2) by solicitation for bids on given quantities of specific products. When the government purchases through solicitations by the Veterans Administration or the Defense Department, the prices to the government are further reduced from commercial wholesale catalog prices, resulting in the government getting Lilly products at prices lower than anyone else.

11. The Comptroller General of the United States appeared before the Subcommittee on Monopoly of the Senate Select Committee on Small Business in 1971. During those hearings, which were concerned with the status of competition in the pharmaceutical industry, the costs of drugs procured by the government were discussed at length. Upon learning of the existence of the access-to-records clause in negotiated contracts, the Chairman of the Subcommittee stated to the Comptroller General:

"I realize it may be a very complicated matter, but it would seem to me that all companies ought to be served notice that the GAO is going to utilize this statute. I think that *we* ought to take a look at some of those costs." *Hearings on Competitive Problems in the Drug Industry, supra,* at 8020. (Emphasis added.)

12. Following those hearings, a series of conversations were held between members of the Chairman's staff and GAO officials. These conversations, as reflected in the contemporary correspondence of the participants, reveal most clearly the character of the government's interest in pharmaceutical industry cost records. Cost and profit data was to be obtained about individual drugs and about individual drug companies. That information would then be publicly released. Specifically, a subcommittee staff preference was expressed that "rather than attempt to obtain such costs records under an arrangement that would preclude reporting of manufacturing firm name or identifying individual drug items," it was preferable "to press for obtaining such records without any strings attached so that the high profits could be publicized by product and firm". As recently as April 29, 1974, it was stated that the only way the GAO could serve the Subcommittee's objectives "will be to gather and publicize specific price and cost data for individual products—particularly those for which competition is limited and price mark-ups are high". The Chairman's staff told the GAO that it "should obtain the cost records without any strings attached so that the information could be used as needed." The Subcommittee's avowed purpose for wanting

industry and company cost data has continued to date and the GAO admits to knowing of no change in the Subcommittee's intended use of the data sought.

13. The GAO thus proceeded to seek access to drug companies' records because, in light of the Subcommittee's demands, "it appears from a long-range Office viewpoint that there is no viable alternative than to press the companies for access to their cost data." The GAO believed that if it gained access to the cost records, it "would obtain cost data of some sort on individual drug items with unusually high profit history that could be used to direct public attention to an individual item and an individual drug manufacturer." Although the GAO considered alternative studies which would not result in the identification of costs of individual drugs and individual drug companies, it stated that one disadvantage of those alternatives was that "Congressional committees concerned with unit costs would not be satisfied." As late as July, 1974, the GAO again considered one such alternative using a third-party to do the examination of the records, but there was "considerable concern as to whether such an arrangement would be acceptable," to members of the Senate Committee.

14. In order to satisfy the interest of the Subcommittee and at the same time make an economic study of the pharmaceutical industry, the GAO initially sought access to drug companies' cost records on a voluntary basis. In late 1972, the GAO approached the Pharmaceutical Manufacturers Association ("PMA") and requested its member firms to participate in a study of the pharmaceutical industry, its production process, efficiency, costs and profits. This initial proposal was rejected because it was not feasible and because the confidentiality of the drug companies' data would not be protected. The GAO then modified its objectives by June, 1973, and proposed a revised study to be conducted in two phases.

15. In Phase I of that study the GAO intended to learn the general nature, peculiarities and problems of the pharmaceutical industry, focusing specifically on manufacturing processes, accounting systems, and marketing policies, and to select the areas to be studied in depth in Phase II. Phase I was to include visits to the facilities of the cooperating pharmaceutical companies.

16. Lilly and five other pharmaceutical companies volunteered to participate in Phase I with the understanding that access to detailed cost records pertaining to specific products would not be granted. During October, 1973, GAO officials visited and inspected Lilly's facilities and operations in Indianapolis and consulted at length with a number of Lilly officials. The GAO also made similar visits to the five other cooperating pharmaceutical companies.

17. On March 21, 1974, GAO met with representatives of the six cooperating companies to present and discuss its preliminary Phase I findings. On or about April 17, 1974, GAO issued the Phase I report in written form and a proposal for Phase II. Detailed and specific comments on the GAO report were submitted by PMA on behalf of the six cooperating companies, and separate comments were also submitted by the individual cooperating companies, including Lilly.

18. The Comptroller General, following the receipt of the critical comments upon his Phase II proposal, decided to abandon the plan of obtaining the drug companies' records on a voluntary basis. In August, 1974, the Comptroller General sent demand letters to the six drug companies who had volunteered to cooperate during Phase I asking for access to their cost and pricing records on individual products purchased under specified contracts. The demand letters were released only after the GAO conferred with the Committee Chairman and obtained his approval. Moreover, after the letters were sent, the GAO has had continued correspondence with the Chairman in order to report the status of its attempt to gain access to the drug companies' cost records.

19. The Comptroller General's demand letter to Lilly dated August 26, 1974, claims authority under the access-to-records clause in the seven negotiated contracts described

in paragraphs 6–9 hereof. The letter begins:

"As you know, because of the increasing Federal involvement in the procurement of pharmaceuticals, the General Accounting Office has underway a review of the procurement of drugs by agencies of the Federal Government, including the pricing of drugs and pharmaceuticals procured under negotiated contracts. This examination is being conducted at several drug companies, including Eli Lilly and Company * * *.

"For some time we have been attempting to gain access to records we consider necessary to conduct such a review. In this regard, in June 1973 we met with representatives of the Pharmaceutical Manufacturers Association and six drug firms to initiate a comprehensive review using data provided on a voluntary basis by representative industry firms. However, the industry firms have not provided us access to the records necessary to satisfactorily carry out our statutory responsibilities."

The Lilly records to be examined are described as:

" * * * all books, documents, papers, and other records directly pertinent to the contracts, which include, but are not limited to (1) records of experienced costs including costs of direct materials, direct labor, overhead, and other pertinent corporate costs, (2) support for prices charged to the Government, and (3) such other information as may be necessary for use to review the reasonableness of the contract prices and the adequacy of the protection afforded the Government's interests. * * * "

20. The government concedes that there is no reason to believe that Lilly did anything illegal, improper or fraudulent in the negotiation or performance of the seven contracts involved in this suit. The government concedes that there is no reason to believe the government was induced by Lilly to enter into any contract here involved or to agree to any term of any such contract as a result of Lilly's failure to disclose information required to be disclosed at the time of contracting. The government also concedes that Lilly was not required to submit any cost or pricing data at the time these contracts were entered into. Specifically with respect to the DSA contracts, cost and pricing data were not required because the agency had determined that the contract price for one such contract was based upon adequate price competition and that the contract prices of the remaining such contracts were based on established catalog or market prices of commercial items sold in substantial quantities to the general public. With respect to the VA contract, cost and pricing data were not required because the purchasing agency had determined that the contract price was based on established catalog or market prices of commercial items sold in substantial quantities to the general public.

21. Further, the government concedes that its purpose is not to audit Lilly's negotiations and performance of the contracts involved in this suit. It was asked and responded to Lilly's Interrogatory 12 as follows:

"*Plaintiff's Interrogatory No. 12*

"Is the sole purpose of the requested examination of Lilly's books and records to audit Lilly's negotiations and performance of the contracts involved in this suit? If the answer is in the negative, state all the purposes for which the requested examination is sought?

"*Answer to Interrogatory No. 12*

"The sole purpose of the requested examination of Lilly's books and records is not to audit Lilly's negotiations and performance of the contracts involved in this suit. Rather, the purpose of the requested examination, as presently contemplated, is to review contract pricing by the Government's suppliers, including Lilly, of drug items to determine the adequacy of the protection afforded the Government by the negotiation techniques used by the procuring agencies. Accomplishment of this objective is contingent upon GAO's ability to gain access to the records needed to (1) ascertain the nature of

the activities for which the drug firms are incurring costs, (2) to ascertain and verify the extent to which the costs of these activities affect the prices paid by the Government for items procured under the specified negotiated contracts, and (3) to determine the bases of firms' pricing considerations for the products and, particularly, the applicability of these considerations to any Federal procurement of the products involved."

22. The government also admits that one purpose of its study "is to have a better public understanding and legislative understanding of the economics of the industry."

23. Lilly has refused to comply with the Comptroller General's demand letter of August 26, 1974, on the ground that the Comptroller General's demand exceeds his authority under the access-to-records clause and statutes, for two reasons: (a) the request is being made for an improper purpose; and (b) the records requested do not directly pertain to, and involve transactions relating to, the seven particular contracts involved in this suit.

24. Among the major items of cost incurred by Lilly in producing and marketing its pharmaceutical products, including those sold to the government, are general administrative costs, marketing costs, and research and development costs. These major items are not assigned or allocated to individual pharmaceutical products or sales contracts under Lilly's accounting system and no generally accepted accounting principle exists for making such an allocation of those types of indirect costs to specific products or specific contracts.

25. The records of Lilly which the Comptroller General seeks to examine contain confidential business information and secrets, and Lilly would, if such information were made public, suffer irreparable competitive injury in excess of $10,000.00.

## II.

### Conclusions of Law

1. The Court has jurisdiction over the subject-matter of this action and personal jurisdiction over the parties.

2. There is no genuine issue or substantial controversy as to the existence of the aforesaid material facts.

3. The Comptroller General's August 26, 1974, demand for access to Lilly's records exceeds his authority under the access-to-records clause in the contracts and under the statutes, 10 U.S.C. § 2313(b) and 41 U.S.C. § 254(c), because the Comptroller General is using that authority for a purpose which neither the contract clauses nor the statutes were designed to serve, namely, for the purpose of conducting a research study on the economics of the entire pharmaceutical industry. Any administrative authority to investigate may be exercised only for a purpose for which the authority is granted. *Burlington Northern, Inc. v. Interstate Commerce Comm'n*, 149 U.S.App. D.C. 176, 462 F.2d 280 (1972), *cert. denied* 409 U.S. 891, 93 S.Ct. 120, 34 L.Ed.2d 148 (1972); *Chattanooga Pharmaceutical Ass'n v. United States Dep't of Justice*, 358 F.2d 864 (6th Cir. 1966); *Shasta Minerals & Chemical Co. v. Securities & Exchange Comm'n*, 328 F.2d 285 (10th Cir. 1964); *Montship Lines, Ltd. v. Federal Maritime Board*, 111 U.S.App.D.C. 160, 295 F.2d 147 (1961). Here, the purpose of the Comptroller General's access-to-records authority under negotiated contracts is to permit audits of the negotiations and performance of particular contracts awarded by negotiation. Congress has not given the Comptroller General coercive power to require private companies to participate in research projects undertaken by the GAO pursuant to 31 U.S.C. § 53 or otherwise, and his limited authority under the access-to-records clause in negotiated contracts cannot be used for such a broad purpose. *United States v. Humble Oil & Refining Co.*, 488 F.2d 953 (5th Cir. 1974), *vacated*, 421 U.S. 943, 95 S.Ct. 1670, 44 L.Ed.2d 97 (1975), *on remand*, 518 F.2d 747 (5th Cir. 1975).

Moreover, construing the Comptroller General's limited access authority under negotiated contracts to permit access for an investigation of an entire industry would raise serious constitutional questions be-

cause of the Fourth Amendment's requirement that an administrative agency's demand for corporate records be relevant in purpose. *See v. City of Seattle*, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). Therefore, the Comptroller General's authority must be narrowly construed to limit the right of access to the purpose for which the right was granted, namely, to audit particular negotiated contracts. *United States v. Humble Oil & Refining Co., supra; Civil Aeronautics Board v. United Airlines, Inc.*, 399 F.Supp. 1324 (N.D.Ill.1975).

4. The Comptroller General's August 26, 1974, demand for access to Lilly's records also exceeds his authority under the access-to-records clause and statutes because the categories of records described in that request do not directly pertain to, and involve transactions relating to, the particular contracts involved in this suit. Since each of the contracts was a fixed-price contract awarded to Lilly solely on the basis of competitive bids received or a comparison of Lilly's offered price with its standard catalog price, and since each contract was exempt from the Truth-In-Negotiation Act and Renegotiation Act, neither the negotiations nor performance terms of the contracts were in any way dependent upon, or directly related to, Lilly's costs of production, profits or methodology by which Lilly establishes its prices, including its standard catalog prices. Therefore, records relating to those types of information do not directly pertain to, and involve transactions relating to, the particular types of negotiated contracts involved in this suit.

In addition, even if cost and pricing records were deemed relevant to these types of negotiated contracts, the Comptroller General's demand in this case still exceeds his authority because the demand is too broad. The request for records relating to Lilly's pricing would encompass records relating to the methods by which Lilly establishes its standard catalog prices. Those catalog prices, however, were necessarily set without regard to the particular contracts involved in this suit. Likewise, the Comptroller General's request for cost records encompasses records relating to non-allocated and non-allocable costs, including general administrative costs, marketing costs, and research and development costs, which Lilly does not assign or allocate to particular products or contracts, and which are incurred without relation to a particular product or contract. Therefore, the Comptroller General's demand encompasses pricing and cost records which are not directly pertinent to, and do not involve transactions relating to, the particular products purchased under the particular contracts involved in this suit.

5. Lilly is entitled to a judgment as a matter of law on its Complaint and on the government's Counterclaim.

6. Lilly is entitled to a permanent injunction enjoining the Comptroller General, his agents, servants, employees and attorneys, and all persons in active concert or participation with them, from examining or attempting to examine the records of Lilly described in the Comptroller General's demand letter of August 26, 1974.

IT IS THEREFORE ORDERED, ADJUDGED and DECREED THAT:

(1) The motion for summary judgment of the defendant-intervenor, the United States of America, be, and the same hereby is, denied.

(2) The motion for summary judgment of the plaintiff, Eli Lilly and Company, be, and the same hereby is, granted in all respects.

(3) The Comptroller General's August 26, 1974, demand to examine Lilly's records exceeds his legal authority under 10 U.S.C. § 2313(b) and 41 U.S.C. § 254(c) and the access-to-records clauses in the seven contracts involved in this suit. Under that authority, the Comptroller General has the right to examine Lilly's contract files on the specified contracts and other records which would enable the Comptroller General to determine:

(a) Lilly's standard catalog prices for the products purchased under the specified contracts;

(b) That the prices of the products purchased were based upon established catalog or market prices of commercial items sold in substantial quantities to the general public; and

(c) That the prices received by the government under the contracts were equal to or less than the catalog prices.

The Comptroller General has no right to examine records of Lilly under 10 U.S.C. § 2313(b) and 41 U.S.C. § 254(c) or under the access-to-records clauses now before the Court, including particular Lilly cost records and pricing records, except those records referred to above.

(4) The Comptroller General, his agents, servants, employees and attorneys, and all persons in active concert or participation with them, are permanently enjoined from examining or attempting to examine Lilly records, except those specified above, under 10 U.S.C. § 2313(b) and 41 U.S.C. § 254(c) and under the access-to-records clauses now before the Court.

(5) The Counterclaim of the defendant-intervenor, the United States of America, be, and the same hereby is, dismissed.

(6) Costs be assessed against the defendant and defendant-intervenor.