BOWSHER, COMPTROLLER GENERAL OF THE
UNITED STATES, ET AL. *v.* MERCK & CO., INC.

No. 81–1273.   Argued December 1, 1982—Decided April 19, 1983*

*Together with No. 81–1472, *Merck & Co., Inc.* v. *Bowsher, Comptroller General of the United States, et al.*, also on certiorari to the same court.

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, POWELL, and REHNQUIST, JJ., joined, and in Part V of which WHITE and MARSHALL, JJ., joined. WHITE, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL, J., joined, *post*, p. 845. BLACKMUN, J., filed an opinion concurring in part and dissenting in part, in which STEVENS, J., joined, *post*, p. 860.

*Jerrold J. Ganzfried* argued the cause for petitioners in No. 81–1273 and respondents in No. 81–1472. With him on the briefs were *Solicitor General Lee, Assistant Attorney General McGrath, Deputy Solicitor General Geller,* and *Michael Kimmel.*

*Philip A. Lacovara* argued the cause for respondent in No. 81–1273 and petitioner in No. 81–1472. With him on the briefs was *Ronald A. Stern.*†

JUSTICE O'CONNOR delivered the opinion of the Court.

The issue before the Court is the scope of the authority of the Comptroller General of the United States to examine the records of a private contractor with whom the Government has entered into fixed-price[1] negotiated contracts. We conclude that, under the circumstances presented in this action, the Comptroller General may inspect the contractor's records of direct costs, but not records of indirect costs.

I

In 1973 Merck & Co., Inc. (Merck), entered into three contracts with the Defense Supply Agency of the Department of Defense and one contract with the Veterans' Administration for the sale of pharmaceutical products to the Government. All four contracts were negotiated, rather than awarded after formal advertising.[2] The pharmaceutical products sup-

---

†*Robert D. Wallick* filed a brief for the Aerospace Industries Association of America, Inc., as *amicus curiae* urging reversal.

*Stanley L. Temko* and *Charles Lister* filed a brief for SmithKline Corp. as *amicus curiae.*

[1] A pure fixed-price contract requires the contractor to furnish the goods or services for a fixed amount of compensation regardless of the costs of performance, thereby placing the risk of incurring unforeseen costs of performance on the contractor rather than the Government. See 1 R. Nash & J. Cibinic, Federal Procurement Law 413 (3d ed. 1977). Variations on the pure fixed-price contract may contain some formula or technique for adjusting the contract price to account for unforeseen cost elements. See *id.,* at 413–415 (discussing fixed-price contract with escalation clause, fixed-price incentive contract, and fixed-price redeterminable contract).

[2] The Government employs two methods of procurement: advertised procurement, *i. e.,* formal solicitation of competitive bids, and procurement by

plied under each contract were standard commercial products sold by Merck in substantial quantities to the general public. App. 41a.  The price term proposed by Merck for each contract was based on the catalog price at which Merck sold the item to the general public or was otherwise determined by adequate competition.  Before the award of each of the contracts at the fixed price proposed by Merck, there was no actual negotiation of price, and the Government contracting officers did not request Merck to submit cost data in connection with any of the four contracts.

As required by 10 U. S. C. § 2313(b) and 65 Stat. 700, 41 U. S. C. § 254(c),[3] each contract contained a standard access-

---

negotiation.  A negotiated contract is the method authorized by statute for use in situations in which the formal advertising and bidding procedure is deemed impractical or unnecessary.  See 10 U. S. C. § 2304(a); 41 U. S. C. § 252(c).  In procuring by negotiation, the Government agency discusses the terms of the procurement with one or more contractors and awards the contract to the party offering the terms most advantageous to the Government.

[3] Title 10 U. S. C. § 2313(b), which applies to the Defense Supply Agency contracts, provides:

"Except as provided in subsection (c), each contract negotiated under this chapter shall provide that the Comptroller General and his representatives are entitled, until the expiration of three years after final payment, to examine any books, documents, papers, or records of the contractor, or any of his subcontractors, that directly pertain to and involve transactions relating to, the contract or subcontract."

The Veterans' Administration contract is governed by 41 U. S. C. § 254(c), which provides in pertinent part:

"All contracts negotiated without advertising . . . shall include a clause to the effect that the Comptroller General of the United States . . . shall until the expiration of three years after final payment have access to and the right to examine any directly pertinent books, documents, papers, and records of the contractor or any of his subcontractors engaged in the performance of and involving transactions related to such contracts or subcontracts."

Despite the slight difference in wording, there is no substantive difference between the defense and civilian procurement statutes.

to-records clause granting the Comptroller General the right to examine any directly pertinent records involving transactions related to the contract. Relying on these clauses, in August 1974 the Comptroller General issued a formal demand to Merck for access to the following:

"all books, documents, papers, and other records directly pertinent to the contracts, which include, but are not limited to (1) records of experienced costs including costs of direct materials, direct labor, overhead, and other pertinent corporate costs, (2) support for prices charged to the Government, and (3) such other information as may be necessary for use to review the reasonableness of the contract prices and the adequacy of the protection afforded the Government's interests." App. 18a.[4]

---

[4] The Comptroller General issued identical demands to five other pharmaceutical companies. These access-to-records demands apparently were the product of congressional interest in competition and profits in the pharmaceutical industry generally.

As early as 1971, Senator Gaylord Nelson suggested during hearings on competition in the drug industry that the Comptroller General invoke his access-to-records authority "to take a look" at the costs incurred by pharmaceutical companies. Hearings on Competitive Problems in the Drug Industry before the Subcommittee on Monopoly of the Senate Select Committee on Small Business, 92d Cong., 1st Sess., 8020 (1971). Following those hearings, Senator Nelson's staff continued to urge the General Accounting Office (GAO) to use the access provisions to obtain cost records "without any strings attached so that the high profits could be publicized by product and firm." App. 144a; id., at 142a–148a. See also Hearings, supra, at 8537, 8581–8583.

Finally in June 1973, the GAO responded by proposing a two-phase study of the economics of the pharmaceutical industry to be accomplished through voluntary participation by drug companies. Merck and five other companies agreed to cooperate in the first phase, which contemplated gathering background data on the industry. In April 1974, the GAO issued a proposal for the second phase of the study, aimed at developing data on "salient economic and operational aspects of the industry." App. 141a.

Merck refused to comply with the Comptroller General's request and commenced this action in the United States District Court for the District of Columbia, seeking a declaratory judgment that the Comptroller General's access demand exceeded his statutory authority.[5] The United States intervened and counterclaimed to enforce the Comptroller General's demand.

The District Court granted partial summary judgment for each party. Rejecting Merck's argument that cost records are not "directly pertinent" to the fixed-price contracts that were the predicate of the General Accounting Office (GAO) demand, the court permitted access to all records

> "directly pertaining to the pricing and cost of producing the items furnished by . . . Merck under the . . . contracts . . . including manufacturing costs (including raw and packaging materials, labor and fringe benefits, quality control and supervision), manufacturing overhead (including plant administration, production planning, warehousing, utilities and security), royalty expenses,

_____

Merck expressed its concern over participating in this phase without adequate assurance of the confidentiality of the cost data it might be requested to supply.

Initially the GAO agreed that the data regarding individual companies and individual drug products should remain confidential and anonymous. *Id.*, at 150a. Senators Nelson and Kennedy and their staffs, however, reiterated that the Subcommittee's objectives could be served only by publication of the data. *Ibid.* The Comptroller General's formal demand letters to the six companies that had participated voluntarily in the Phase I study followed.

[5] Four of the remaining five pharmaceutical companies that received demand letters also challenged the Comptroller General's request. See *SmithKline Corp.* v. *Staats,* 668 F. 2d 201 (CA3 1981), cert. pending, Nos. 81–2082, 81–2268; *Bristol Laboratories Division of Bristol-Myers Co.* v. *Staats,* 620 F. 2d 17 (CA2 1980) *(per curiam),* aff'd by an equally divided Court, 451 U. S. 400 (1981); *United States* v. *Abbott Laboratories,* 597 F. 2d 672 (CA7 1979); *Eli Lilly & Co.* v. *Staats,* 574 F. 2d 904 (CA7), cert. denied, 439 U. S. 959 (1978).

and delivery costs." App. to Pet. for Cert. in No. 81–1273, p. 39a.

The court barred access, however, to records "with respect to research and development, marketing and promotion, distribution, and administration (except to the extent such data may be included in the cost items listed above)." *Id.*, at 40a. In a brief *per curiam* opinion, the United States Court of Appeals for the District of Columbia Circuit affirmed. *Merck & Co.* v. *Staats*, 214 U. S. App. D. C. 418, 665 F. 2d 1236 (1981).

Both parties sought certiorari. In No. 81–1273, the United States petitioned for review of the Court of Appeals' determination that records of Merck's indirect costs are not subject to examination by the Comptroller General. In No. 81–1472, Merck challenges the determination that records of its direct costs are "directly pertinent" to the contracts in question and are therefore subject to examination. Merck also contends that access to its cost records is barred because the Comptroller General's access demand was not made for a congressionally authorized purpose. We granted certiorari on the petitions of both parties, 456 U. S. 925 (1982), and now affirm.

## II

As with any issue of statutory construction,[6] we " 'must begin with the language of the statute itself.' " *Bread Political Action Committee* v. *FEC*, 455 U. S. 577, 580 (1982), quoting *Dawson Chemical Co.* v. *Rohm & Haas Co.*, 448 U. S. 176,

---

[6] The parties agree that the scope of the Comptroller General's authority under the access-to-records clauses in the four contracts turns on the meaning of the statutory language, rather than on the intention of the parties to the contract. We also emphasize at the outset that Merck does not challenge the authority of Congress to impose, as a condition of doing business with the Government, a requirement that contractors disclose all of their cost records to the Comptroller General, regardless of the pertinence of these records to the particular contract. Rather, Merck bases its arguments on its interpretation of the statutory language.

187 (1980). The focal point of controversy is the meaning of the statutory phrase "directly pertain to and involve transactions relating to the contract." See n. 3, *supra*. It is plain from the face of the provisions that these are words of limitation designed to restrict the class of records to which access is permitted by requiring some close connection between the type of records sought and the particular contract.[7]

The legislative history of the access provisions underscores what the language reflects: the intention of Congress to limit to some degree the Comptroller General's access powers. As originally introduced, the bill now codified as 10 U. S. C. § 2313(b) and 41 U. S. C. § 254(c) provided access to "pertinent" records "involving transactions related to" the contract. See 97 Cong. Rec. 13371 (1951).[8] Representative

[7] In partial dissent, JUSTICE BLACKMUN objects that, after a nod in the direction of the statutory language, we inexplicably wander off to explore the statutory purposes. *Post*, at 860. As we observe *infra*, at 834, however, the statutory language does not tell us exactly which records are subject to GAO examination. It is a well-settled canon of statutory construction that, where the language does not dictate an answer to the problem before the Court, "we must analyze the policies underlying the statutory provision to determine its proper scope." *Rose* v. *Lundy*, 455 U. S. 509, 517 (1982). Accordingly, we examine the legislative history to assess the purposes Congress sought to serve by the language it chose. As shown *infra*, the statutory purposes clearly revealed by the legislative record justify allowing access to direct cost records.

[8] This bill was modeled on, and as originally proposed was identical to, a January 1951 amendment to the First War Powers Act of 1941. See Act of Jan. 12, 1951, 64 Stat. 1257. That amendment was a piece of emergency legislation adopted in response to the crisis conditions created by the Korean War. Because of severe wartime inflation, many defense contractors holding fixed-priced contracts could not meet their obligations. To alleviate the problem, Congress gave President Truman emergency authority to renegotiate Government contracts. See H. R. Rep. No. 3227, 81st Cong., 2d Sess., 3–4 (1950). The access-to-records provisions were included in order to deter fraud and profiteering in the renegotiation process. 96 Cong. Rec. 17123 (1951) (remarks of Rep. Celler) ("The amendment will give power to the General Accounting Office to go into the books and delve into the records of these contractors who have been relieved to determine

Hoffman opposed the original bill on the ground that it permitted "unnecessary snooping expeditions" and allowed the GAO to "go into everybody's business and look it over if they just wanted to take a look at it." *Id.*, at 13373. He therefore offered a floor amendment to insert the word "directly" before the word "pertinent," stating that the purpose of the amendment "is to limit the 'snooping' that may be carried on under this bill." *Id.*, at 13377. The sponsor of the original bill, Representative Hardy, did not oppose the amendment, and the amendment passed without debate or discussion.

The passage of the Hoffman amendment clearly reveals that Congress did not want unrestricted "snooping" by the Comptroller General into the business records of a private contractor. The Government nevertheless attempts to discount the significance of Congress' addition of the word "directly." Based on the lack of opposition to the limiting amendment by the bill's sponsor and the lack of debate, the Government argues that the Hoffman modification did not significantly alter the scope of the Hardy bill. We cannot agree. The only explanation in the legislative history of the meaning and purpose of the amendment is that of Representative Hoffman. His statement, which, as the explanation of the sponsor of the language, is an "authoritative guide to the statute's construction," *North Haven Board of Education* v.

---

whether or not there is fraud or overreaching or whether they have done anything untoward").

Although the initial access-to-records legislation in the January 1951 amendments was of limited duration, Congress shortly thereafter passed the permanent version at issue here. Representative Hardy, the sponsor of both the temporary and permanent access-to-records provisions, learned that Government procurement officers were negotiating contract modifications under two permanent procurement statutes that lacked access provisions, the Armed Services Procurement Act of 1947 and the Federal Property and Administrative Services Act of 1949. "In order to plug this loophole," Representative Hardy introduced the bill to require inclusion of access-to-records clauses in contracts negotiated under these statutes. 97 Cong. Rec. 13198 (1951) (remarks of Rep. Hardy).

*Bell*, 456 U. S. 512, 527 (1982), expressly indicates that the intent of the amendment was to curtail the scope of investigation authorized under the bill.   Although, as the Government emphasizes, Representative Hoffman did not have the votes to defeat the bill in its entirety, he nevertheless had the votes to circumscribe the inquiry that the Comptroller General was authorized to undertake.   Moreover, to accept the Government's contention that the amendment had no substantive effect would contradict the settled principle of statutory construction that we must give effect, if possible, to every word of the statute.   *Fidelity Federal Savings & Loan Assn.* v. *De la Cuesta*, 458 U. S. 141, 163 (1982).   Therefore, in our attempt to give meaning to the words "directly pertinent," we must be mindful of Congress' aim to protect contractors from broad-ranging governmental intrusion into their private business affairs.

It does not follow, however, that our interpretation of the language added by the Hoffman amendment must be guided solely by that policy, for it is expressive of only one of the aims embraced by Congress in enacting the access-to-records provisions.   The legislative history also reveals that Congress sought, in granting the GAO this access authority, to equip that agency with a tool to detect fraud, waste, inefficiency, and extravagance in Government contracting generally.   Representative Hardy, the sponsor of the legislation, explained that the two major purposes of the bill were "to give the Comptroller General the proper tools to do the job the Congress has instructed him to do . . . and . . . to provide a deterrent to improprieties and wastefulness in the negotiation of contracts."   97 Cong. Rec. 13198 (1951).   With regard to the former purpose, it is clear that Congress envisioned use of the access authority as an adjunct to the Comptroller General's statutory responsibility to "investigate . . . all matters relating to the receipt, disbursement, and application of public funds" and to "make recommendations looking to greater economy or efficiency in public

expenditures." 31 U. S. C. § 53(a). See also 31 U. S. C. §§ 60, 65(a).[9] Obviously, broad access to cost records would enhance the GAO's ability to evaluate the reasonableness of the price charged the Government and to identify areas of waste and inefficiency in procurement.

Because of the lack of debate or discussion of the Hoffman amendment, however, we do not have any indication in the legislative history, nor indeed in the language of the statute itself, of the scope of access authority left to the GAO after the restrictive words were added to the bill. In defining the degree of limitation, we thus traverse uncharted seas guided only by the two general statutory purposes reflected in the legislative history. Consequently, our task in construing the statutes as they apply in this action is to give effect to both of these congressional aims. The tension between these goals is apparent. For some industries and some types of contracts, including perhaps those at issue here, neither objec-

---

[9] Representative Hardy further explained the inspiration for the bill. Because of the absence of competitive safeguards when the Government procures by negotiation rather than by formal solicitation of bids, Representative Hardy identified a need to establish "every reasonable safeguard against waste and extravagance in the spending of" Government funds in the context of negotiated contracts. 97 Cong. Rec. 13198 (1951). By permitting the GAO "to check the transaction both from the Government records and the contractors' books," the bill would ensure that the Government did not "come out on the short end of the deal." *Ibid.* Representative Hardy then cited a number of "typical situations in which the authority of this bill would play an effective part." *Ibid.* One example dealt with detection of an inefficient market structure under which, because the Government was purchasing automotive parts from a dealer who in turn bought from a middleman, the Government was paying a price that included "profits upon profits and completely wasteful administrative and handling costs." *Ibid.*

Thus, contrary to Merck's assertion, the 1951 access statutes were designed to detect more than fraud and abuse in the negotiation of procurement contracts. Representative Hardy himself remarked that GAO review under the access provisions would disclose "a lot of other situations besides those involving fraud." *Id.,* at 13199.

tive can be achieved fully without sacrificing the other.[10] Given these dual, conflicting aims, we must balance the public interest served by full GAO investigations against the private interest in freedom from officious governmental intermeddling in the contractor's private business affairs.

---

[10] It is possible that the 1951 Congress was aware of this tension. The addition of the Hoffman amendment was a clear compromise. Representative Hoffman had adamantly opposed the Hardy bill from the outset because of the breadth of authority it would give to the GAO. The amendment he offered emerged from a discussion between Representative Hardy and Representative Hoffman and represented the extent of the limitation upon GAO's access authority that Representative Hardy would accept. See 97 Cong. Rec. 13377 (1951) (remarks of Rep. Hoffman).

It does not follow, as JUSTICE WHITE assumes, *post*, at 852, from the fact that the Hoffman amendment was a compromise that the restrictive language is to be given no effect at all. In dissent, JUSTICE WHITE refers to the Hoffman amendment as "largely a sop to the bill's opponents." *Post*, at 853. The legislative record, however, tells us that a majority voted for the Hoffman amendment, and we must give weight to the expressed will of a legislative majority. JUSTICE WHITE also interprets the Hoffman amendment as an "assurance that the bill would not be used as a basis for inspection of books and records having no substantial connection with Government procurement." *Ibid.* Notwithstanding this recognition of the amendment's purpose, however, JUSTICE WHITE adopts a construction of "directly pertinent" that completely eviscerates the limiting purpose of the Hoffman amendment, for he would allow the GAO access to any records helpful in determining the amount of profit being made by the contractor. See *post*, at 856. Thus, under the guise of "interpretation" of the statute, JUSTICE WHITE has "construed" the statute so broadly as to give it a reading indistinguishable in effect from the bills to expand the GAO's access authority that were rejected by Congress in the 1970's. See n. 12, *infra*. Such an approach therefore bespeaks legislation, rather than interpretation.

Recognizing the extreme encroachment upon the privacy of a contractor's business records which his interpretation of the statutes would permit, JUSTICE WHITE attempts to bring "balance" and "reason" to bear on the situation by invoking courts' powers under Fourth Amendment principles to limit the GAO's right of access. *Post*, at 857–858. If, however, Congress had intended the GAO demands to be limited only by the Fourth Amendment, it need not have concerned itself with requiring that records be directly pertinent to the contract.

## III

### A

The Government contends that the Court of Appeals erred in holding that records of Merck's indirect costs[11] are not "directly pertinent" to the contracts in question. In so arguing, the Government maintains that Merck's indirect costs are directly pertinent to the fixed-price contracts because Merck uses payments made by the Government under these contracts to defray indirect expenses. Thus, the Government would have us define as "directly pertinent" the records of any costs defrayed from commingled general revenues that include Government payments under the contract.

We cannot accept this interpretation of the statute, however, for it completely eviscerates the congressional goal of protecting the privacy of the contractor's business records. Under the Government's proposed definition, records of expenditures to purchase raw materials for the manufacture of an entirely different product than that sold under the Government contract or to invest in the stock of another corporation would be subject to inspection by the Comptroller General. Hence, the Government's interpretation would permit far-ranging governmental scrutiny of a contractor's business records of nongovernmental transactions completely unrelated to either the contract underlying the access demand or the product procured under that contract. Indeed, carried to its logical extreme, the argument would dictate that few, if any, of a private contractor's business records would be immune from GAO scrutiny. In short, the Government's proposed definition of the statutory language admits of no doctrinal limitation, effectively reading the Hoffman limiting language and its "antisnooping" policy out of the statute.

---

[11] By indirect costs we mean costs incurred in the areas of research and development, marketing and promotion, distribution, and administration, which are not directly attributable to a particular product.

## B

Nor are we persuaded by the Government's argument that the GAO's consistent and longstanding interpretation of its authority under the access-to-records statutes supports the view that indirect cost records are subject to examination under the fixed-price contracts in question here. Even if that interpretation could be characterized as consistent, it would not be entitled to deference, for, as we have noted above, it is inconsistent with the statutory language. See *Southeastern Community College* v. *Davis*, 442 U. S. 397, 411 (1979).

Moreover, to characterize the GAO's current sweeping view of its access authority as "consistent" would be generous. There is significant evidence indicating that in the past the GAO itself has acknowledged a deficiency in its statutory authority to examine indirect cost records.[12] For example,

---

[12] It is significant to note that the profit study of the defense industry, which Congress authorized as part of the Military Appropriations Act of 1970, Pub. L. 91–121, § 408, 83 Stat. 204, is the only occasion on which Congress has deliberately granted the GAO the kind of broad-ranging authority it asserts here. In conferring this authority, Congress, wary of equipping the GAO to conduct a "fishing expedition," 115 Cong. Rec. 25795 (1969) (remarks of Sen. Ribicoff), carefully limited such authority to "only a single study." *Id.*, at 25793 (remarks of Sen. Proxmire).

Although not conclusive with respect to interpretation of the 1951 access statutes, subsequent congressional rebuffs of GAO requests for expansion of its access authority are instructive both with regard to the GAO's view of the limits of the 1951 legislation and Congress' apparent reluctance to broaden that legislation. For example, a Senate bill introduced in 1973 directed that "the Comptroller General . . . shall . . . have access for the purpose of audit and examination to any books, documents, papers and records . . . which *in the opinion of . . . the Comptroller General may be related or pertinent* to the . . . contracts . . . [or] subcontracts." S. 2049, 93d Cong., 1st Sess. (1973) (emphasis added). Another Senate bill which, like S. 2049 never emerged from committee, would have granted the Comptroller General authority to undertake a study of profits made on Government and commercial contracts by contractors having Government contracts aggregating $1 million or more. To enable the Comptroller General to make such studies, the bill gave him the authority to demand from

in a ruling of particular significance for the facts of this case, the Comptroller General determined in 1967 that the access provisions do not confer upon the GAO the right to examine records relating to a contractor's nongovernmental business, even when such review is necessary to determine whether a catalog-priced item was actually sold in substantial quantities to the general public. App. 162a–163a. Moreover, in late 1969, the GAO prepared a memorandum for Congress in connection with congressional consideration of a proposed grant of additional access authority to the GAO to pursue a study of contractor profits in the defense industry. In the memorandum, the GAO informed Congress that its authority under the 1951 access provisions did not extend to review of records of a contractor's nongovernmental business and that additional access authority was therefore necessary to conduct a profit study. 115 Cong. Rec. 25800–25801 (1969) (reprinting GAO Memorandum on the Adequacy of the Legal Authority of the Comptroller General to Conduct a Comprehensive Study of Profitability in Defense Contracting). Finally, a 1970 internal memorandum also reveals the GAO's belief that amendment of the 1951 access statutes would be necessary to give it the power to examine records of *indirect costs*. App. 160a–161a.[13]

The only statements by the GAO directly supportive of its position here occur in testimony before a congressional Sub-

---

the contractor "such information maintained in the normal course of business . . . as the Comptroller General determines necessary or appropriate." S. 3014, 93d Cong., 2d Sess. (1974). See also S. 2268, 94th Cong., 1st Sess. (1975).

[13] We observe that JUSTICE WHITE's dissent makes no attempt at all to deal with this evidence of the GAO's own view of the limits of its access authority. Given the GAO's historic position, excepting of course its position in the *Hewlett-Packard* case and the current litigation, see *infra*, contractors like Merck who entered into fixed-price negotiated contracts with the Government had no reason to expect that consenting to inclusion of the access-to-records clause would subject their businesses to the kind of broad-ranging inquiry which JUSTICE WHITE's dissent approves.

committee in 1963 regarding the GAO's litigation of the scope of its access authority in *Hewlett-Packard Co.* v. *United States*, 385 F. 2d 1013 (CA9 1967), cert. denied, 390 U. S. 988 (1968).[14]  In light of the GAO's litigation posture during these hearings, as well as the contrary expressions of GAO opinion noted above, this testimony cannot provide persuasive evidence of the GAO's consistent interpretation or practice.

## IV

To summarize, the Government has failed to offer a definition of "directly pertinent" that would give any effect to the limiting purpose of that language.  In our view, the appropriate accommodation of the competing goals reflected in the legislative history counsels us to draw the line precisely

---

[14] *Hewlett-Packard*, like this case, involved a request by the Comptroller General to review cost records of a contractor who entered into fixed-price negotiated contracts.  During that litigation, a congressional Subcommittee commenced hearings to investigate "the need for, or desirability of, recommending legislative action" in light of Hewlett-Packard's refusal to permit inspection of its cost records under the access provisions.  Hearings on Relation of Cost Data to Military Procurement before the Subcommittee for Special Investigations of the House Committee on Armed Services, 88th Cong., 1st Sess., 3 (1963).  During the course of these hearings, Robert F. Keller, General Counsel of the GAO, testified concerning the GAO's position with respect to the Hewlett-Packard situation.

"It is our position that the contract clause and the statute give us the right to examine the cost records of the contractor and other pertinent data that relates *[sic]* to the items included in the contract, in sufficient completeness and detail to permit us to determine the reasonableness of the negotiated prices." *Id.*, at 10.

Mr. Keller further stated that the GAO could "go beyond direct manufacturing costs" into such areas as "how research costs are allocated as between the Government contract and commercial business." *Id.*, at 23.

In legislative hearings in 1965, which in part addressed "the extent of the GAO's right to examine contractor books and records," Hearings on Comptroller General Reports to Congress on Audits of Defense Contracts before a Subcommittee of the House Committee on Government Operations, 89th Cong., 1st Sess., 3 (1965), the Comptroller General again referred to his position in the *Hewlett-Packard* case, which was still pending in the courts, regarding the proper interpretation of the access provisions. *Id.*, at 45.

where both lower courts have drawn it. Thus, under the four fixed-price contracts in question, the Comptroller General should be permitted access to records of direct costs.[15] He should be barred, however, from inspecting records of costs incurred in the areas of research and development, marketing and promotion, distribution, and administration, except to the extent the contractor has allocated these costs as attributable to the particular contract.[16]

Direct costs certainly pertain directly to even a fixed-price contract, for direct costs are, by definition, readily identifiable as attributable to the specific product supplied under the contract. Consequently, as a rational businessman, the contractor will have some regard for these costs in setting even a catalog price in order to avoid a loss on the product. Because these costs therefore have a very direct influence on the price charged the Government, the GAO would need to

---

[15] Direct costs would include the direct manufacturing and overhead costs incurred in producing the specific drug items procured under the four contracts, as identified by the District Court. See *supra*, at 829–830.

[16] JUSTICE WHITE objects that this line drawing permits a contractor to restrict the GAO's access authority by the particular accounting practices the contractor chooses to adopt. *Post*, at 856–857, n. 18. That objection, however, is not accurate. We have indicated that, as a general matter, because of the congressional intent to protect the privacy of the contractor's records involving nongovernmental transactions, the Government is precluded from inspecting records of indirect costs. Nevertheless, the Government is permitted access to some records falling within the latter category if the contractor has made the extra effort of identifying, for his own purposes, some indirect costs that he thinks may be attributable to specific products. To the extent the contractor has done so, the Government is permitted access to records of those costs. This principle does not tie the Government's entire access authority to the accounting practices adopted by the contractor. Such inspection represents a windfall, as it were, to the Government based upon the extra effort the contractor has made in allocating his costs. Without that effort, the Government would not otherwise be permitted to inspect such records because of privacy concerns. Given this added benefit to the Government, it is anomalous to argue that its access authority is being "limited" by the contractor's accounting method.

examine records of these costs to determine whether the contractor is making an excessively high profit or the Government is getting a "fair deal" under the contract. Presumably, indirect costs also influence in some manner the setting of a catalog price, although to what extent is unclear, given the somewhat arbitrary accounting allocations that must be made to determine what portion of indirect costs may be attributed to a specific product. Nevertheless, the degree of intrusion into the contractor's private business affairs occasioned by GAO scrutiny of indirect cost records is far greater, particularly where pure fixed-price contracts are involved. Such an inspection would entail exposure to the GAO of many of the contractor's nongovernmental transactions.[17] We therefore conclude that the appropriate balance of public and private interests in this situation weighs in favor of access to direct cost records but against access to Merck's indirect cost records.[18] Our decision in this regard is

---

[17] By contrast, where the contract that serves as the predicate for the GAO's access demand is cost-based—as in a cost-plus contract—the contractor is in no position to complain of the intrusiveness of GAO inspection of indirect cost records. By claiming from the Government full reimbursement for these costs under the cost-based contract, the contractor represents that these costs are justified as attributable to the performance of the Government contract, and not to any nongovernmental transactions. Therefore, the public interest served by permitting the GAO to inspect records supporting these claims clearly outweighs any privacy interests the contractor possesses in those records.

[18] JUSTICE WHITE suggests that, when indirect cost records relate both to governmental and nongovernmental transactions, the GAO should be permitted access to the records of any indirect costs that it can prove had a direct and substantial impact on the price charged to the Government under the contract. *Post*, at 857. This approach is unworkable for both the Government and contractors. To decide these "close questions" of direct pertinence, the parties to the fixed-price contract may be forced to resort to the courts. Bright-line rules upon which the parties' expectations may be firmly established are preferable to the protracted litigation that JUSTICE WHITE's suggestion would engender.

in accord with that of the majority of the Courts of Appeals to have considered this issue.[19]

The Government objects strenuously that barring such access impermissibly constrains the GAO in its efforts to improve the procurement process. In an industry in which indirect costs represent such a large proportion of total costs,[20] access to records of those costs is critical to an understanding of the industry with which the Government is dealing and to an assessment of the fairness of the contract price and the advisability of continued adherence to the negotiated procurement methods employed under those contracts.[21]

As we have already noted, however, in adopting the Hoffman amendment, Congress was apparently willing to forgo the benefits that might be gained from permitting the GAO broad access to the contractor's business records in order to protect those contractors from far-reaching governmental scrutiny of their nongovernmental affairs. By inclusion of that language, Congress injected into the determination of which records are accessible considerations besides the Gov-

---

[19] In addition to the decision below, see *SmithKline Corp.* v. *Staats*, 668 F. 2d 201 (CA3 1981), cert. pending, Nos. 81–2082, 81–2268, and *Bristol Laboratories Division of Bristol-Myers Co.* v. *Staats*, 620 F. 2d 17 (CA2 1980) *(per curiam)*, aff'd by an equally divided Court, 451 U. S. 400 (1981). See also *Hewlett-Packard Co.* v. *United States*, 385 F. 2d 1013 (CA9 1967) (permitting access to records of direct production costs, including direct material, direct labor, and overhead costs), cert. denied, 390 U. S. 988 (1968).

[20] The Government suggests that direct costs may represent as little as 9% of the sales price of a pharmaceutical product. Brief for Petitioners in No. 81–1273, p. 34.

[21] We observe, however, that the Government has conceded in this action that it has no reason to suspect that Merck has engaged in any fraud or impropriety in connection with the negotiation or performance of these contracts. App. 41a–44a, 76a. Nor does the Government have any reason to believe that the prices charged under these contracts were unreasonable in any way. *Id.*, at 42a, 76a. In fact, the price under each of the contracts was the lowest price at which Merck sold each of the products to anyone at the time the contracts were awarded. *Id.*, at 26a, 42a.

ernment's need for the information. Thus, any impediment that our holding places in the path of the GAO's power to investigate fully Government contracts is one that Congress chose to adopt,[22] and any arguments that this situation should be changed must be addressed to Congress, not the courts.[23]

## V

We address briefly Merck's contention that there is yet another independent ground upon which the Comptroller General should be denied access to any of its cost records. Merck argues that the GAO is not entitled to examine these records because the access demand was not made for a congressionally authorized purpose. Specifically, Merck contends that the access-to-records statutes do not permit the Comptroller General to request records for the purpose of either conducting an economic study of the pharmaceutical industry or securing information desired by individual Members of Congress.

Much of what we have already said provides an answer to this contention. The legislative history reveals that Congress granted the GAO authority to examine directly pertinent records under individual procurement contracts in order to assess the reasonableness of the prices paid by the Government and to detect inefficiency and wastefulness. Given this authorized purpose, there is no reason to conclude that the GAO may not compile the information that it may lawfully

---

[22] The extent of any burden is, however, unclear. In fact, in testimony before Congress the Comptroller General candidly expressed doubts about the usefulness of access to records of indirect costs in the pharmaceutical industry, suggesting that the attempt to determine from these records the portion of indirect costs allocable to individual drug products would be "a waste of time." Hearings on Competitive Problems in the Drug Industry before the Subcommittee on Monopoly of the Senate Select Committee on Small Business, 92d Cong., 2d Sess., 8578 (1972).

[23] The GAO's own recognition of this dilemma has prompted it, as outlined in n. 12, *supra*, to seek expanded access authority from Congress. Its efforts for expansion are more appropriately directed to that forum.

obtain, within the statutory limits outlined above, from an investigation of individual contracts in order to arrive at a picture of the pharmaceutical industry generally.[24] Moreover, the fact that two Senators encouraged the GAO to use its lawful authority to the fullest extent possible is irrelevant. The GAO is an independent agency within the Legislative Branch that exists in large part to serve the needs of Congress. If the records sought by the GAO are within the scope of the access-to-records provisions, the fact that the Comptroller General's request had its origin in the requests of Congressmen or that the GAO reported the data to Congress does not vitiate its authority.

## VI

Because of the GAO's mandate to detect fraud, waste, inefficiency, and extravagance through full audits of Government contracts, we cannot accept Merck's view that the only records directly pertinent to the four fixed-price contracts at issue are those necessary to verify that Merck actually had an established catalog price for the item procured, that it sold the items in substantial quantities to the general public at the catalog price, that it delivered the product specified, and that it received from the Government no more than the amount due under the contract. On the other hand, given the policy of protecting the privacy of contractors' business records also expressed in the statutory language and legislative history,

---

[24] The record indicates that compilation of information lawfully obtainable under its access authority is what the GAO intended to accomplish. One GAO official explained: "[I]f we were to use our right of access under specified Federal contracts, we would attempt, *insofar as possible*, to present a report similar to that which we had proposed to present under the April 1974 proposal [for the second phase of the economic study of the pharmaceutical industry]." App. 154a–155a (emphasis added). GAO officials also recognized that the statutory restrictions on its access authority would necessitate some changes in the approach contemplated under the prior two-phase study based on the voluntary participation of the pharmaceutical companies. *Ibid.*

neither can we accept the Government's contention that it must be permitted access to *all* of Merck's cost records. Accordingly, we affirm the judgment below.

*It is so ordered.*

JUSTICE WHITE, with whom JUSTICE MARSHALL joins, concurring in part and dissenting in part.

I join Part V of the Court's opinion, and I concur in the remainder to the extent it upholds the GAO's right to inspect Merck's "direct" cost records.[1]   I dissent to the extent the Court refuses to allow the GAO access to *any* of Merck's "indirect" cost records.

The statutory provisions at issue, 10 U. S. C. § 2313(b) and 41 U. S. C. § 254(c), clearly were intended to allow the GAO the right to a reasonable degree of access to contractors' records needed to determine whether prices charged to the Government were excessive.   Of course, this right was not intended to be unlimited; the Court correctly identifies a congressional intent to protect private contractors from "officious governmental intermeddling." *Ante*, at 835.

---

[1] The Court correctly rejects Merck's contention that *none* of its cost records are subject to inspection by the GAO.   Merck's theory has been emphatically rejected by every Court of Appeals that has considered it. In addition to the opinion below in the present case, *Merck & Co.* v. *Staats*, 214 U. S. App. D. C. 418, 665 F. 2d 1236 (1981), see *SmithKline Corp.* v. *Staats*, 668 F. 2d 201 (CA3 1981), cert. pending, Nos. 81–2082, 81–2268; *United States* v. *Abbott Laboratories*, 597 F. 2d 672 (CA7 1979); *Eli Lilly & Co.* v. *Staats*, 574 F. 2d 904 (CA7), cert. denied, 439 U. S. 959 (1978); and *Hewlett-Packard Co.* v. *United States*, 385 F. 2d 1013 (CA9 1967), cert. denied, 390 U. S. 988 (1968).   Apparently recognizing the untenability of the argument advanced here by Merck, the pharmaceutical manufacturer in *Bristol Laboratories Division of Bristol-Myers Co.* v. *Staats*, 428 F. Supp. 1388 (SDNY 1977), aff'd, 620 F. 2d 17 (CA2 1980), aff'd by an equally divided Court, 451 U. S. 400 (1981), did not even dispute that it was "obliged by the terms of the contracts to provide access to records of its manufacturing costs, records which relate to the pricing of the products delivered and records required to verify all data obtained during the course of the review."   428 F. Supp., at 1389.

Unfortunately, for the conceded purpose of creating a bright-line test, *ante*, at 841, n. 18, the Court goes astray by adopting a rule that flatly bars the GAO from access to all indirect cost records pertaining to most fixed-price contracts, regardless of how urgent the need for them might be. The Court frankly admits that its rule may deny the GAO access to cost records critical to an assessment of the fairness of the contract price, thereby impeding the GAO's ability to protect the public against wasteful Government expenditures. *Ante*, at 842–843. These undesirable consequences could be avoided, without sacrificing the contractors' right to be free from unwarranted GAO "snooping," by holding the Government to the burden of showing that requested records likely had a direct and substantial impact on the price charged to the Government and thus are "directly pertinent" to the contract.

## I

In each of the four contracts involved here, the United States agreed to purchase certain pharmaceutical products from Merck at a fixed price. In each instance, Merck proposed a contract price based on its catalog or "market" price, and the Government contracting officer accepted the proposal without any "haggling" or other negotiation as to price. Each of the contracts contains the statutorily mandated provision allowing the GAO the right to inspect Merck's books and records that are "directly pertinent" to the contract.

The GAO now seeks to examine those Merck records that indicate the cost to Merck of the goods sold to the Government. The GAO deems such an examination necessary to carry out its statutory duty to "investigate . . . all matters relating to the receipt, disbursement, and application of public funds," and to "make recommendations looking to greater economy or efficiency in public expenditures." 31 U. S. C. § 53(a).

By inspecting Merck's cost records, the GAO hopes to be able to estimate whether the contract price paid by the Gov-

ernment was a fair one. The GAO has confirmed by experience the common-sense observation that the mere "fact that a product is listed in a manufacturer's catalog and offered to any customer is no assurance that . . . the standard catalog price is reasonable."[2] If the GAO's inspection were to reveal that Merck's prices were unreasonably high, the GAO presumably would recommend to the contracting agencies that they "negotiate prices more carefully or . . . obtain greater competition in future similar procurements,"[3] or that they take other action "looking to greater economy or efficiency," 31 U. S. C. § 53(a), in future expenditures.

The Court concludes, however, that, despite the inclusion of the access-to-records provision in the contracts, the GAO has no right to inspect any of Merck's indirect cost records to determine how much it cost Merck to produce the products sold to the Government. This holding exalts the contractors' privacy interest to such a degree that it displaces the GAO's right to inspect records unquestionably needed for an accurate determination of the fairness of the contract price. Congress did not intend this order of priority of interests. What Congress did intend was that contractors be spared the burden of *unwarranted* intrusions. Congress did not want the GAO to be irresponsibly "snooping" into records lacking relevance to the question whether the Government paid a fair price for the products it purchased. But Congress did not wish to deny the GAO access to records legitimately needed to detect waste, extravagance, and ineffective procurement. To the extent the GAO can prove that some or all of a contractor's indirect cost records fall into this latter category, the GAO's right of access should be sustained.

---

[2] Hearings on Relation of Cost Data to Military Procurement before the Subcommittee for Special Investigations of the House Committee on Armed Services, 88th Cong., 1st Sess., 8 (1963) (remarks of Robert F. Keller, General Counsel of the GAO).

[3] App. 23a (affidavit of Paul G. Dembling, General Counsel of the GAO).

## II

I begin with the language of the statute. *Jackson Transit Authority* v. *Transit Union*, 457 U. S. 15, 23 (1982); *Touche Ross & Co.* v. *Redington*, 442 U. S. 560, 568 (1979). The legislation at issue requires unadvertised Government contracts to include a clause allowing the GAO to examine any of the contractor's books, documents, papers, or records "that directly pertain to, and involve transactions relating to, the contract . . . ." 10 U. S. C. § 2313(b). See 41 U. S. C. § 254(c).

"'[I]t is hard to imagine anything more directly related to a contract than the cost of producing the items covered by it or the matters going into the makeup of the price.'" *Eli Lilly & Co.* v. *Staats*, 574 F. 2d 904, 913 (CA7), cert. denied, 439 U. S. 959 (1978). Accord, *SmithKline Corp.* v. *Staats*, 668 F. 2d 201, 208–209 (CA3 1981), cert. pending, Nos. 81–2082, 81–2268; *Hewlett-Packard Co.* v. *United States*, 385 F. 2d 1013, 1016 (CA9 1967), cert. denied, 390 U. S. 988 (1968). The Court does not contend otherwise. Indeed, all the Court has to say about the literal statutory wording is that it requires "some close connection between the type of records sought and the particular contract." *Ante*, at 831. But there is, of course, no reason why the records of all indirect costs inherently lack the requisite "close connection." As the Court fully recognizes, *ante*, at 842–843, in some instances indirect costs have a critical bearing on the makeup of the contract price. The Government should at least be allowed an opportunity to prove that such is the case, and, to the extent it succeeds in this endeavor, the GAO should be allowed access.

## III

Even if, contrary to my belief, the statutory language is somehow regarded as ambiguous, resort to the legislative history further refutes the Court's position. The legislative history of the access-to-records provisions is relatively brief and to the point. It demonstrates beyond doubt that Con-

gress authorized the GAO to examine all of a contractor's books legitimately needed to evaluate Government procurement techniques by ascertaining whether the Government had paid a reasonable price for the contractor's goods or services.

Representative Hardy, the bill's sponsor, indicated that the bill was intended to improve the adequacy of Government procurement techniques in various ways. He expressly remarked:

> "The major purposes of this bill are twofold: One, to give the Comptroller General the proper tools to do the job the Congress has instructed him to do; and, two, to provide a deterrent to improprieties and wastefulness in the negotiation of contracts." 97 Cong. Rec. 13198 (1951).

As noted *supra*, at 846, Congress has instructed the GAO to "investigate . . . all matters relating to the receipt, disbursement, and application of public funds," and to "make recommendations looking to greater economy or efficiency in public expenditures." 31 U. S. C. § 53(a).[4]

Representative Hardy early explained to his colleagues that normal procurement procedures called for competitive bidding but that procurement by negotiation was sometimes necessary. In the latter context, where there is no competitive bidding to "operat[e] as a brake on the price which a contractor can demand from the Government," Representative Hardy saw the need to establish "every reasonable safeguard against waste and extravagance in the spending" of Government funds. 97 Cong. Rec., *supra*, at 13198. He felt that, no matter how "conscientious and honest" the Government representatives might be, the contractor's representatives would, in the great majority of cases, have a tremendous ad-

---

[4] In addition, "[t]he Comptroller General is authorized and directed to make an expenditure analysis of each agency in the executive branch of the Government . . . which . . . will enable Congress to determine whether public funds have been economically and efficiently administered and expended." 31 U. S. C. § 60.

vantage from the standpoint of both training and experience. *Ibid.* Thus, there was "every chance in the world that the Government [would] come out on the short end of the deal," and Representative Hardy deemed it necessary to "at least enable the [GAO] to check the transaction, both from the Government records and the contractors' books." *Ibid.*

The debate continued two days later when Representative Hardy proposed an amendment that would have allowed agency heads the discretion to omit the access-to-records clause from contracts with foreign contractors, *id.*, at 13371, and Representative Harvey proposed an amendment that would have exempted "a manufacturer or processor who is a supplier of material to a primary contractor and who is not a subcontractor" from the scope of the bill's coverage. *Id.*, at 13376. Both of these proposals were ultimately defeated, but, during the lively debate on the proposed amendments, several Members of Congress stated without contradiction that the bill would allow the GAO extremely broad authority to examine records. For example, Representative Harvey asked whether, if the bill became law, a subcontractor of a primary Government contractor "would be subject to having *all* of his books opened up for inspection by Government officials." *Id.*, at 13372 (emphasis added). Representative Hardy replied that it would, unless the subcontractor only supplied some "casual item" in connection with the performance of the contract. *Ibid.* Based on this understanding, Representative Harvey later argued that his limiting amendment was needed, because otherwise "every manufacturer . . . of . . . goods that eventually find their way into defense production . . . is going to have to supply all the answers to the GAO on everything he manufactures." *Id.*, at 13376. "[E]very section of his books will have to come under the complete scrutiny of the GAO." *Ibid.* In response, Representative Hardy did not dispute this characterization of the scope of the GAO's authority, but he nevertheless opposed the Harvey amendment, because it "would make it impossi-

ble frequently to obtain information which would be vital in the study of a contract." *Ibid.*

Representative Hoffman, a strong opponent of the bill, several times during the debate observed that the "GAO under this bill can go into the books of [contractors] and ask and get from them anything and everything they want." *Id.,* at 13373. He indicated his belief that the bill would allow the GAO "to snoop into [a contractor's] books and find out what [the goods or services] cos[t] or what will be a fair price or what profit we make." *Ibid.* See also *id.,* at 13375, 13377. Standing alone, of course, the statements of an opponent of the bill, such as Representative Hoffman, would not carry much weight,[5] but here, even though all comments pro and con were made in the midst of a free-wheeling debate, the proponent of the bill, Representative Hardy, in no way took issue with Representative Hoffman's view of the scope of the GAO's authority. Representative Hardy's essential response was that it was necessary to require contractors to afford the GAO this broad authority, and that Representative Hoffman's fears of excessive GAO "snooping" were groundless, because the GAO would have neither the inclination nor the manpower to examine the records of every individual supplier. *Id.,* at 13376, 13377.

The original Hardy bill required the inclusion, in negotiated contracts, of a clause allowing the GAO the right to examine any records that were "pertinent" to the contract. At the very end of the debate, Representative Hoffman proposed the amendment that added the word "directly" before the word "pertinent." *Id.,* at 13377. Representative Hoffman explained that he had discussed his amendment with Representative Hardy, the bill's sponsor, and that, although the amendment was "not all that it should be," it was the

---

[5] See, *e. g., National Woodwork Manufacturers Assn.* v. *NLRB,* 386 U. S. 612, 639–640 (1967); *Schwegmann Bros.* v. *Calvert Distillers Corp.,* 341 U. S. 384, 394 (1951).

most that Representative Hardy would agree to.  *Ibid.*[6]
Representative Hoffman then stated that the purpose of his
amendment was "to limit the 'snooping' that may be carried
on under this bill which we do not have the votes to defeat."
*Ibid.*  At that point, Representative Hardy remarked that
he had no objection to the amendment, and it was accepted
without further discussion.  *Ibid.*[7]

In light of Representative Hardy's consistent position
throughout the debate, it cannot plausibly be argued that he
agreed to the Hoffman amendment with the understanding
that it effected a drastic reduction in the scope of the bill's
coverage or purpose.  As outlined above, Representative
Hardy continuously spoke of the need to provide a mecha-
nism to combat waste and extravagance in federal procure-
ment, and he vigorously and successfully opposed the Harvey
amendment, which would have significantly limited the bill's

---

[6] In fact, it appears that it was Representative Hardy, *not* Represent-
ative Hoffman, who proposed the language of the amendment that limited
the Government to "directly pertinent" records.  Representative Hoffman
stated that this language was "the best *he* [Representative Hardy] *could
think of.*"  97 Cong. Rec. 13377 (1951) (emphasis added).  Apparently
what happened is that Representative Hoffman and Representative Hardy
had a private meeting, during which Representative Hoffman suggested
the need for a limiting amendment.  Representative Hoffman had
stronger language in mind, which Representative Hardy refused to accept.
Representative Hardy must have then proposed the "directly pertinent"
language to placate his colleague, and Representative Hoffman, though not
satisfied, "was rather forced to accept it and to agree with him."  *Ibid.*
Thus, although the Court is correct in stating, *ante,* at 833, that the
amendment "circumscribe[d] the inquiry the Comptroller General was au-
thorized to undertake," it is clear that this circumscription was only to the
extent agreeable to Representative Hardy, who, as shown by his opposi-
tion to the Harvey amendment, and his other remarks throughout the de-
bate, clearly would not have agreed to a sharp reduction in the scope of his
bill.

[7] Immediately after passage of the Hoffman amendment, the House
passed the bill, as amended, 97 Cong. Rec. 13378 (1951).  On the following
day, the Senate passed it without any debate whatsoever.  *Id.,* at 13411.

scope. His acceptance of the addition of the word "directly" may have been largely a sop to the bill's opponents. The most that can be said is that Representative Hardy accepted the amendment to allay concerns that the legislation "would let the GAO go into everybody's business and look it over if they just wanted to take a look at it." *Id.*, at 13373 (Rep. Hoffman). The amendment gave assurance that the bill would not be used as a basis for inspection of books and records having no substantial connection with Government procurement. But the amendment definitely was not intended to bar the GAO's access to records legitimately needed to assess the reasonableness of prices charged to the Government, and thereby to protect the Government against waste, excessive prices, and ineffective procurement.[8]

## IV

Despite the plain statutory language and legislative history, the Court refuses to uphold the GAO's right of access to all cost records that are essential to an accurate determination of whether the Government wasted money by entering into these contracts. Adopting the so-called *"Bristol* test,"[9] the Court affirms a judgment that limits the GAO's access to records pertaining to a contractor's

> "manufacturing costs (including raw and packaging materials, labor and fringe benefits, quality control and supervision), manufacturing overhead (including plant

---

[8] Accord, *Merck & Co.* v. *Staats,* 214 U. S. App. D. C., at 431, 665 F. 2d, at 1249 (Mikva, J., concurring in part and dissenting in part); *Eli Lilly & Co.* v. *Staats,* 574 F. 2d, at 916; Comment, 92 Harv. L. Rev. 1148, 1157–1158 (1979) ("The court [in *Eli Lilly*] correctly rejected Lilly's argument that the insertion of the word 'directly' into the 'directly pertinent' formula sharply narrowed the scope of inquiry to be allowed the GAO").

[9] The test was first adopted by the District Court in *Bristol Laboratories Division of Bristol-Myers Co.* v. *Staats,* 428 F. Supp. 1388 (SDNY 1977), aff'd, 620 F. 2d 17 (CA2 1980), aff'd by an equally divided Court, 451 U. S. 400 (1981).

administration, production planning, warehousing, utilities and security), royalty expenses, and delivery costs." [10]

The *Bristol* test excludes

"books, documents, papers, or records with respect to research and development, marketing and promotion, distribution and administration (except to the extent such data may be included in the cost items listed above)." [11]

The Court describes this test, perhaps inaccurately, [12] as being based on a "direct costs v. indirect costs" or an "allocated costs v. unallocated costs" dichotomy.

The courts that have adopted this test have no doubt been influenced by a need to come up with *some* form of reasonable limitation on the broad access demand the GAO has made. The GAO claims it has the right to examine records pertaining to *every* cost "defrayed from commingled general revenues that include the Government's payments under the contract." I agree that the GAO's demand is somewhat overbroad; the Court correctly observes, *ante*, at 836, that it would require Merck to allow inspection of cost records totally unrelated to the Government contracts, such as records of expenditures for raw materials used to manufacture products other than those sold to the Government under the contracts. [13] However, I am not convinced that the proper conclusion is to limit the GAO to the cost records allowable under the *Bristol* test.

The *Bristol* court adopted its standard solely on the basis of the cost records that the contractor was *willing* to disclose

[10] App. to Pet. for Cert. in No. 81–1273, p. 39a. See *ante*, at 829–830.

[11] App. to Pet. for Cert. in No. 81–1273, p. 40a. See *ante*, at 830.

[12] The *Bristol* court itself stated that the costs records held examinable under its test are "by no means . . . limit[ed]" to direct costs. 428 F. Supp., at 1391.

[13] The Court is also correct in concluding, *ante*, at 837–839, that, because the GAO's interpretation of the statute has not been consistent, it is not entitled to particular deference.

to the GAO. The court felt that the contractor's offer "reflected a responsible and reasonable effort to distinguish 'directly pertinent' matter within the meaning of the access to records clause." [14] The court thus accepted the contractor's contention that the cost records it was not willing to disclose had "only the most general relation, if any, to the prices charged." [15]

Although cost records having, at most, only an insubstantial relation to the price charged are not "directly pertinent" to the contract, it is apparent that many of the records deemed unexaminable under *Bristol* relate to costs that may have had a critical bearing on the prices charged, and that would be of central importance to a GAO inquiry into the fairness of these prices. In the pharmaceutical industry, it has been estimated that "direct" or "allocated" costs constitute only about nine percent of the sale price of individual products. The so-called "indirect" or "unallocated" costs—primarily research and development, advertising and other promotion, general administrative expenses, and taxes—and profit are much larger and economically more significant. [16] Yet, under the *Bristol* test, the GAO is denied access to *all* records in this category, thus making it impossible for the GAO to make an accurate assessment of the fairness of the prices and thus the adequacy of the Government's procurement technique. [17]

---

[14] 428 F. Supp., at 1391.

[15] *Id.*, at 1390.

[16] *Eli Lilly & Co.*, *supra*, at 913; *Merck & Co.* v. *Staats*, *supra*, at 429, 665 F. 2d, at 1247 (Mikva, J., concurring in part and dissenting in part); Reekie, Price & Quality Competition in the United States Drug Industry, 26 J. Indus. Econ. 223, 235 (1978); Rucker, Public Policy Considerations in the Pricing of Prescription Drugs in the United States, 4 Int'l J. Health Services 171, 173 (1974).

[17] For example, the *Bristol* test might not allow the GAO to examine a contractor's records of advertising costs. One would imagine that, if the GAO were aware that a great percentage of the cost of the products of a certain company went to support a large advertising campaign, rather

In my view, the correct rule in a case of this nature is that any books or records that bear directly on the question whether the Government paid a fair price for the goods or services it purchased are "directly pertinent" to the contract of purchase. Under this test, for example, the cost records of an advertising campaign to promote only the particular products sold to the Government, or a research project designed specifically to develop or improve these products, would clearly be "directly pertinent." [18] On the other hand,

than, say, to maintain quality control, the GAO might recommend to the contracting agency that it not deal with that company in the future. Yet, under the *Bristol* test, the GAO might not be able to obtain the information needed to make such a recommendation.

[18] On this point, the Court and I appear to be in agreement, although this fact is far from clear from the Court's opinion. At one point, the Court defines indirect costs as "costs incurred in the areas of research and development, marketing and promotion, distribution, and administration, *which are not directly attributable to a particular product*." *Ante*, at 836, n. 11 (emphasis added). See also *ante*, at 841 (indirect costs are those requiring "somewhat arbitrary accounting allocations"). This definition indicates the Court agrees with me that records of costs in these areas that *are* directly attributable to the products sold to the Government—such as the cost records of an advertising campaign or a research project designed to promote or develop only the specific products sold to the Government— should be considered "direct costs" that are subject to examination by the GAO.

Potential confusion arises, however, in view of the fact that the Court affirms the judgment below in its entirety, even though that judgment can perhaps be read as denying the GAO access to product-specific records in areas such as advertising and research. The judgment denies access to all records in areas such as research and advertising, "except to the extent such data may be included in the cost items [to which the GAO is allowed access]." *Merck & Co.* v. *Staats*, 214 U. S. App. D. C., at 428, 665 F. 2d, at 1246. Product-specific records in areas such as advertising and research do not appear to be included among any of the access-permitted cost items mentioned in the judgment, unless it can be said that they constitute records of "manufacturing costs." See *ibid.*

The Court adds to the uncertainty with its statement, *ante*, at 840, that the GAO should be allowed access to records in such areas as research and advertising "to the extent the contractor has allocated these costs as attrib-

records of advertising campaigns and research projects involving only unrelated products would lack the requisite degree of pertinence. Of course, in many instances a commercial advertisement or a research project will be designed to promote or develop both products sold to the Government and other, unrelated products. With respect to cost records of efforts such as these, there might be some close questions as to whether such records are "directly pertinent" to the Government contracts. If, however, the GAO could bear the burden of proving that the records are of costs that likely had a direct and substantial impact on the price charged to the Government under the contract, I would allow the GAO access to the records.

## V

The inquiry does not necessarily come to an end once the GAO establishes that it has a statutory and contractual right to inspect particular records. In addition to the statutory

utable to the particular contract." This language suggests that the contractor can avoid a GAO examination of even product-specific records in these areas by arbitrarily refusing to attribute these costs to the specific products.

In light of the Court's emphasis on the need for "[b]right-line rules upon which the parties' expectations may be firmly established," *ante,* at 841, n. 18, it is surprising that the Court is not precise on this point. My "objection" is not, as the Court indicates, *ante,* at 840, n. 16, that the Court ties the GAO's ability to inspect indirect cost records to the contractor's accounting practices. Rather, my concern is with the tension between the Court's holding and the judgment it affirms without modification. Under the Court's rationale, product-specific research and advertising costs are "direct costs" and are subject to GAO inspection regardless of the contractor's accounting practices. It is not clear that the judgment below permits this result. Nor is it clear that the judgment would allow the GAO to conduct a "windfall" inspection of contractor-allocated indirect cost records, which the Court expressly sanctions. *Ibid.* The potential problem arises mainly because the opinion speaks generally of a direct-indirect dichotomy, although it affirms a judgment that may not break down neatly along these lines. In any event, I read the Court's opinion as allowing access to all records that are or must fairly be attributed to the specific products sold to the Government.

"directly pertinent" limitation, the GAO's right of inspection is further circumscribed, and the contractors' right to privacy is further protected, by constitutional standards, such as the Fourth Amendment reasonableness requirement.

Where, as here, the GAO wishes to see a contractor's records and the contractor declines to accede voluntarily to a GAO request, the GAO must issue an administrative subpoena. If the contractor refuses to comply with the subpoena, the GAO must apply to a district court for enforcement of the subpoena. 31 U. S. C. §54(c) (1976 ed., Supp. V).[19]

Once in the district court, a contractor such as Merck has the benefit of all of this Court's jurisprudence limiting the bounds of an agency's right to demand the production of a private entity's records. Essentially, in assessing an agency's application for enforcement of an administrative subpoena, we have insisted that the agency's demand be reasonable. The general rule is that "when an administrative agency subpoenas corporate books or records, the Fourth Amendment requires that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unduly burdensome." *See* v. *City of Seattle*, 387 U. S. 541, 544 (1967). See *United States* v. *Morton Salt Co.*, 338 U. S. 632, 652–653 (1950); *Oklahoma Press Publishing Co.* v. *Walling*, 327 U. S. 186, 208 (1946); 1 K. Davis, Administrative Law Treatise §4:15 (2d ed. 1978). This standard is a flexible one that takes into account the extent to

---

[19] The GAO has had this subpoena power only since 1980. See Pub. L. 96–226, §102(c), 94 Stat. 312 (codified as 31 U. S. C. §54(c) (1976 ed., Supp. V)). Prior to 1980, the GAO could only sue for specific performance of its contractual right of access. See, *e. g.*, *Hewlett-Packard Co.* v. *United States*, 385 F. 2d 1013 (CA9 1967), cert. denied, 390 U. S. 988 (1968). The GAO can still opt in favor of this latter, slower course, but the Government does not make any claim that its rights in a specific performance action would be any different from those in an action for judicial enforcement of an administrative subpoena. See Tr. of Oral Arg. 29–30.

which the public interest will be served if the subpoena is enforced. *See* v. *City of Seattle, supra,* at 545.

In the present case, Merck has claimed that compliance with the GAO's demand would entail substantial expense and disruption of its operations. This claim is based on evidence that the proposed GAO inspection would require Merck to allow an entire team of GAO auditors to remain on site at Merck for over two years.[20] This, of course, is a matter for first-instance determination by the District Court, but, if the proposed GAO inspection would in fact cause such a high degree of interference with Merck's business, a credible argument could be made that compliance would be unreasonable and unduly burdensome and that the GAO's access should therefore be limited in some way.

## VI

In view of the foregoing, I would remand these cases to the District Court, with instructions to uphold the GAO's request for access to Merck's "direct" and "indirect" cost records, but only to the extent that: (1) the records sought by GAO related to costs that likely had a direct and substantial impact on the prices charged to the Government under the contracts; and (2) the request is reasonable in scope and would not unduly burden Merck. To the extent the GAO's demand conforms to these statutory and constitutional standards, Merck should be required to allow the GAO's examination to proceed.[21]

---

[20] At the time the GAO issued its demand for access to Merck's records, it made identical demands to five other drug companies. Apparently, only one of the six companies, Hoffman-LaRoche, Inc. (Hoffman), voluntarily acceded to the GAO's request. According to Merck, a team of GAO auditors remained on site at Hoffman from July 1975 to July 1977 without completing the review, and, in July 1977, Hoffman terminated its voluntary participation. Of course, even if Merck's claim as to the Hoffman precedent is accurate, Merck would have to prove that a GAO review of its records would require similar or greater disruption.

[21] The Court does not explicitly discuss the degree of access permissible to the GAO in instances where the Government enters into a fixed-price

JUSTICE BLACKMUN, with whom JUSTICE STEVENS joins, concurring in part and dissenting in part.

The question before us is the proper construction of the access-to-records clauses required by law to be inserted in various Government contracts. These clauses authorize the Comptroller General to inspect any records that "directly pertain to and involve transactions relating to" the contract into which the clause was inserted. 10 U. S. C. § 2313(b); see 41 U. S. C. § 254(c) (permitting access to "directly pertinent" records "involving transactions related to" the contracts). The Court now holds that these clauses permit access to certain cost records, even when the contract is not cost-based and was negotiated without regard to costs. I cannot agree that cost records are "directly pertinent" to non-cost-based contracts. I therefore dissent insofar as the Court permits access to such records.

The Court correctly begins its analysis by focusing on the language of the statute, noting that it contains "words of limitation designed to restrict the class of records to which access is permitted by requiring some close connection between the type of records sought and the particular contract." *Ante,* at 831. But after this nod in the direction of the statutory language, the Court, unaccountably in my estimation, fails to examine the type of records sought, the nature of the particular contract, and the closeness of the connection between them. Instead, the Court wanders off to explore the general "aims embraced by Congress in enacting the access-to-records provisions": protecting contractors from govern-

---

contract in reliance on cost representations by the contractor. ˙ There can be little doubt, however, that, in such an instance, the GAO is entitled to inspect all of the contractor's cost records, both direct and indirect. Under these circumstances, the contract is "cost-based" and "the public interest served by permitting the GAO to inspect records supporting these claims clearly outweighs any privacy interests the contractor possesses in those records." *Ante,* at 841, n. 17.

mental intrusion, and equipping the General Accounting Office with a tool to detect fraud and waste in Government contracting. *Ante*, at 833. Given the "tension" between these "dual, conflicting aims," the Court concludes that it must "balance the public interest served by full GAO investigations against the private interest in freedom from officious governmental intermeddling in the contractor's private business affairs." *Ante*, at 834–835. The Court then reaches what it deems an "appropriate accommodation of the competing goals reflected in the legislative history" by holding that the Comptroller General may inspect records of "direct costs," but is barred from inspecting other records except to the extent they are allocated to the particular contract. *Ante*, at 839–840.

I agree that the legislative history reflects conflicting congressional goals, but it appears to me that the necessary "balancing" and "accommodation" of these goals has already been accomplished by Congress. Congress may well have intended to give the GAO a tool to detect fraud and waste and to improve the procurement process, but the particular tool it crafted was a limited one. It gave the Comptroller General access to a narrow category of records: those directly pertinent to the contracts between the Government and its contracting partner.

The Court asserts that Merck's records of direct costs are directly pertinent to its contracts with the Government because such costs "are, by definition, readily identifiable as attributable to the specific *product* supplied under the contract." *Ante*, at 840 (emphasis added). Records of indirect costs are not pertinent to Merck's contracts, the Court says, because such records are "completely unrelated to *either the contract* underlying the access demand *or the product* procured under that contract." *Ante*, at 836 (emphasis added). But, as the Court obviously recognizes, there is a difference between records pertinent to the "contracts" by which the Government does its purchasing, and records pertinent to

"products" ultimately purchased under those contracts.[1]   In interpreting the access-to-records statutes we must "presume that Congress chose its words with . . . care," *FBI* v. *Abramson*, 456 U. S. 615, 635 (1982) (O'CONNOR, J., dissenting), and Congress chose to require pertinence to the specific "contract" at issue, not to the "product" procured.

It is a fundamental canon of statutory construction that "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin* v. *United States*, 444 U. S. 37, 42 (1979).   In its ordinary meaning, a "contract" is a legally enforceable bargain, formed by mutual consent and supported by consideration.   Restatement (Second) of Contracts § 17 (1979); 1 W. Jaeger, Williston on Contracts § 18 (3d ed. 1957).   Particular goods and services may be the subject matter of a contract, but the "contract" itself is the agreement between the parties. Nothing in the legislative history suggests that Congress intended any other meaning by its choice of the word "contract."[2]   The access-to-records statutes were intended to

---

[1] For example, Merck's research notes, pharmaceutical formulas, and other trade secrets might be records directly pertinent to the "products" purchased by the Government, and might be of assistance to the Government in evaluating the success of its procurement policies.   But unless these records were also pertinent to Merck's contracts with the Government, they would not be available to the Comptroller General under his access-to-records authority.

[2] The first Court of Appeals case interpreting the access-to-records statutes, *Hewlett-Packard Co.* v. *United States*, 385 F. 2d 1013 (CA9 1967), cert. denied, 390 U. S. 988 (1968), reached a result similar to that reached by the Court today.   In *Hewlett-Packard*, the Court of Appeals recognized that if the word "contract" were given its ordinary meaning, to refer to "the terms and conditions of an agreement and the procedures whereby those terms and conditions were formulated," cost records could not be regarded as "directly pertinent" to a non-cost-based contract.   385 F. 2d, at 1016.   In an effort to provide the Government with greater access, however, the Court of Appeals invented its own definition of the word "contract."   Without explanation or citation of authority, the Court of Appeals declared:

permit inspection of cost records when the negotiation of a particular contract depended on representations about the contractor's costs, or when the contract price itself varied according to costs. See 97 Cong. Rec. 13198 (1951) (remarks of Rep. Hardy).[3] There is, however, no indication that Con-

"[T]he word 'contract,' as used in this statute is intended to have a broader meaning, embracing not only the specific terms and conditions of the agreement, but also the general subject matter. The subject matter of these four contracts is the procurement of described property by the Government." *Ibid.*

The court concluded that cost records "directly pertain to that subject matter, because if out of line with the contract price, the contract may have been an inappropriate means of meeting this particular procurement need of the Government." *Ibid.*

Although the Court in the present case does not explicitly adopt this strained reading of the word "contract," it approves the so-called *"Bristol test"* which was developed partly in reliance on *Hewlett-Packard,* and partly in response to a decision by one of the parties voluntarily to surrender certain types of records. See *Bristol Laboratories Division of Bristol-Myers Co.* v. *Staats,* 428 F. Supp. 1388 (SDNY 1977), aff'd, 620 F. 2d 17 (CA2 1980), aff'd by an equally divided Court, 451 U. S. 400 (1981). The Court of Appeals in this case and the Court of Appeals for the Third Circuit, *SmithKline Corp.* v. *Staats,* 668 F. 2d 201 (1981), cert. pending, Nos. 81–2082, 81–2268, have applied the *"Bristol test"* without independent analysis. In adopting this test, the Court never explains whether it agrees with the definition of "contract" developed in *Hewlett-Packard,* or whether it believes some other definition leads to the same result.

[3] Representative Hardy, the sponsor of the legislation, gave several examples of contracts in which the access-to-records clauses would be useful. The first was a construction contract in which the Government agreed to pay a fixed overhead rate "as a proportion of direct labor costs or as a lump sum . . . based upon the experience of the contractor in performing similar work in the past." The second was a pair of contracts, one cost-plus and one fixed-price, in which "the contractor was charging to the [cost-plus] contract expenses which should have been charged to the fixed-price contract." The third was a contract with a price redetermination clause, authorizing "an increase or decrease in the price payable under the contract as the work progresses or after it has been completed." 97 Cong. Rec. 13198 (1951). In each of these three examples, the contractor's costs were highly relevant to the negotiation or performance of the contract, and cost records thus would have been pertinent to the contract. But neither Rep-

gress intended to permit such inspection when costs were not relevant to the contract's negotiation, its terms, or its performance.

Apparently recognizing that cost records are not accessible to the Comptroller General unless they bear some relationship to the actual contracts at issue, the Court asserts that direct cost records are pertinent to non-cost-based contracts because "the contractor will have some regard for these costs in setting even a catalog price in order to avoid a loss on the product." The Court concludes that "these costs therefore have a very direct influence on the price charged the Government." *Ante*, at 840.[4] But the fact that costs may affect a seller's decision to offer a certain price does not make costs directly pertinent to the contract. A contract, after all, is a meeting of the minds. Many factors may affect one party's willingness to make an offer or the other party's willingness to accept it, but the vast majority of these factors are not mentioned in the bargaining process and play no part in the agreement ultimately reached. An unarticulated motive for one party's assent to a bargain is not pertinent, much less "directly pertinent," to the bargain itself.

Pursuant to the contracts at issue here, Merck has promised to provide various pharmaceutical products and the Government has promised to pay a certain price. The Government's promise was based on Merck's standard catalog price for the products purchased. Information about Merck's pro-

resentative Hardy nor any other Member of Congress suggested that cost records would be pertinent to a contract in which the price was negotiated without regard to the contractor's costs.

[4] When a contract is not cost-based, the relationship between direct costs and prices may be tenuous. In these cases, there is every reason to suppose that Merck's prices are not related to its direct costs; the Court notes, *ante*, at 842, n. 20, the Government's suggestion that "direct costs may represent as little as 9% of the sales price of a pharmaceutical product." Merck may have taken direct costs into account in setting its catalog price, but it may equally well have relied on other factors, such as market surveys or prices set by its competitors.

duction costs was not requested, and neither the contract price nor its performance was tied to costs in any respect. Merck's costs were thus irrelevant to the bargain reached by the parties. Because the Government chose not to make costs an issue during the negotiations, the terms of the contracts would have been the same whether Merck's costs represented 1 percent, 10 percent, or 100 percent of the price the Government agreed to pay. The conclusion seems inescapable that Merck's costs, and consequently its cost records, are not pertinent to the agreements it entered into with the Government.[5]

If the Government is concerned that it may be paying too high a price for pharmaceutical products, it is always free to ask for cost data in connection with any contract it negotiates in the future. Cost records then would be pertinent, because representations about costs would form part of the basis for the bargain between the parties. In this case, however, costs were not relevant to the Government's decision to contract with Merck. Cost records do not become "directly pertinent" to these contracts simply because the Government now wants information that did not concern it at the time of contracting.

I would hold that when the terms of a contract are not tied to costs and the contractor makes no representations about costs during its negotiations with the Government, cost records do not "directly pertain to and involve transactions relating to the contract" and are not subject to inspection by the Comptroller General. The only records "directly pertinent" to such a contract would be those necessary to verify the terms of the contract and the representations upon which

---

[5] I agree with the Court that the Hoffman amendment, adding the word "directly" before "pertinent" in the statute, was intended to "circumscribe the inquiry that the Comptroller General was authorized to undertake." *Ante*, at 833. I find it unnecessary to place much emphasis on this amendment, however, because I do not regard cost records as being at all pertinent to a non-cost-based contract.

the contract was based. In this case, the Comptroller General's access would be limited to those records necessary to verify that Merck actually had an established catalog price for the products it sold, that it sold the products in substantial quantities to the general public at the catalog price, that it delivered the product specified, and that it received from the Government no more than the amount due under the contract. To the extent the Court concludes that the Comptroller General may obtain Merck's cost records as well, I dissent.